## CHAMBERLAIN v. ST. PAUL AND SIOUX CITY RAILROAD COMPANY ET AL.

1. The act of Congress of March 3, 1857, granting certain lands to the Territory of Minnesota for the purpose of aiding in the construction of several lines of railroad between different points in the Territory, only authorized for each road, in advance of its construction, a sale of one hundred and twenty sections. No further disposition of the land along either road was allowed, except as the road was completed in divisions of twenty miles.
2. Where land is conveyed to the State by a corporation as indemnity against losses on her bonds loaned to it, the bondholders have no equity for the application of the land to the payment of the bonds which can be enforced against the State, and her grantees take the property discharged of any claim of the bondholders.

APPEAL from the Circuit Court of the United States for the District of Minnesota.

The plaintiff is the holder of bonds of the State of Minnesota, amounting to half a million of dollars, and seeks to charge certain lands in the possession of the defendant railroad companies with their payment. The bonds were issued in 1859 to the Southern Minnesota Railroad Company, under the authority of the constitutional amendment of April, 1858. That company was one of the four companies to which the Territory of Minnesota, on the 22d of May, 1857, granted the lands obtained by the act of Congress of March 3 of that year. The grant of the State was made in express terms, subject to the provisions of the act of Congress, and would have been thus subject without any declaration to that effect. The act of Congress only authorized a sale of one hundred and twenty sections for each road in advance of its construction. Any further disposition of the land along either road was allowed only as the road was completed in divisions of twenty miles.

The Southern Minnesota Railroad Company was authorized to construct two of the lines mentioned in the act of Congress, and took, therefore, under the grant of the State, a title to two hundred and forty sections. No title to any greater quantity passed from the State. In allowing one hundred and twenty sections for each line to be disposed of before the construction of any part of the road, Congress intended to furnish aid for such preliminary work as is required in all similar undertakings. We do not understand that the complainant contends that the company acquired an interest in any other lands than the one hundred and twenty sections for each of its roads.

In July of that year, the lines of the two roads were definitely surveyed and located to the extent of the grading subsequently made, and maps of the surveys were filed in the General Land-Office at Washington; but it does not appear that any other work for the construction of either of the roads was done during the year.

The Territory of Minnesota became a State in October, 1857; and was admitted into the Union in May, 1858. Its constitution prohibited the loan of the State credit in aid of any corporation; but the first legislature assembled under it, being desirous of expediting the construction of the lines of road in

aid of which the congressional grant was made, proposed, in March, 1858, an amendment to the constitution, removing this prohibition so far as the four companies named in the act of May 22, 1857, were concerned. The amendment was submitted to the people, and, on the 15th of April of the same year, was adopted. It provided, *first,* for the issue of bonds of the State to the railroad companies; *second,* for taking from them security for the payment of the interest, and against loss on the bonds thus issued; and, *third,* for a forfeiture of the lands and franchises of the companies in case certain portions of their respective roads were not completed within prescribed periods.

1st, The bonds were to be issued to each of the four companies, bearing interest at the rate of seven per cent per annum, payable semi-annually in the city of New York, to an amount not exceeding $1,250,000 in instalments of $100,000, as often as any ten miles of its road were ready for placing the superstructure thereon, and an additional instalment of the same amount as often as that number of miles of the road was fully completed, and the cars were running thereon, until the whole amount authorized was issued. The bonds were to be denominated Minnesota State Railroad Bonds; they were to be signed by the governor, countersigned and registered by the treasurer, and sealed with the seal of the State; they were to be issued in denominations not exceeding $1,000, payable to the order of the company to whom issued, transferable by indorsement of the president of the company, and redeemable at any time after ten and before the expiration of twenty-five years from their date; and for the payment of their interest, and the redemption of their principal, the faith and credit of the State were pledged.

2d, The security to be taken for the payment of the interest on the bonds received by each company was to consist of an instrument pledging the net profits of its road; and the security against loss on the bonds was to consist of a conveyance to the State of the first two hundred and forty sections of land, free from prior incumbrances, which the company was or might be authorized to sell, and a transfer to the treasurer of the State of an amount of first-mortgage bonds on the roads, lands, and franchises of the company, corresponding in amount to the State

bonds issued to it. The delivery of the first-mortgage bonds necessarily implied the execution of a mortgage or deed of trust for their payment. In case either company made default in the payment of the interest or principal of the bonds issued to it by the governor, no more State bonds were to be thereafter issued to that company; and the governor was to proceed to sell, in such manner as might be prescribed by law, its bonds, or the lands held in trust, or require a foreclosure of the mortgage executed by the company to secure its bonds.

3d, Each company which accepted the bonds of the State was required, as a condition thereof, to complete not less than fifty miles of its road on or before the expiration of the year 1861, and not less than one hundred miles before the year 1864, and four-fifths of the entire length of its road before the year 1866; the amendment declared that any failure on the part of the company to complete the number of miles of its road in the manner and within the several times thus prescribed should forfeit to the State all the rights, title, and interest of any kind whatsoever in and to any lands granted by the act of May 22, 1857, together with the franchises connected with the same, not pertaining to the portion of the road then constructed.

The Southern Minnesota Railroad Company accepted the amendment, and executed the pledge of net profits and the conveyance of the two hundred and forty sections required. It also executed a deed of trust upon its roads and all its lands and franchises to secure its first-mortgage bonds, to be transferred to the treasurer when State bonds were received. It then entered upon the construction of its roads, and contracted with the plaintiff to grade and prepare the road-beds for the superstructure. During that and the following year 1859, thirty-seven and a half miles of one of the roads and twenty miles of the other road were thus graded by the plaintiff. As often as any ten miles of either of the roads were ready for the superstructure, the governor issued to the company bonds of the State to the amount of $100,000. Nearly all of these bonds, amounting to half a million of dollars, were transferred to the plaintiff for his work in grading the roads, and are still held by him. They were indorsed by the president of the company with a waiver of presentment, demand, and notice.

An act of the legislature, passed on the 12th of August, 1858, required the first-mortgage bonds of the company to be transferred to the treasurer, to be drawn so that the interest and principal should mature sixty days before the maturity of the interest and principal of the State bonds; and, as the bonds of the company offered were accepted, we assume that they were so drawn.  The act also provided for the foreclosure of the mortgage, or deed of trust, whenever default was made in the payment of either interest or principal.

The company never completed any part of either of its roads, and did nothing more than the grading mentioned; and it made default in the payment of the interest maturing upon the State bonds, and also in the payment of the interest accruing on its first-mortgage bonds.  The governor thereupon proceeded under the above act, and an act passed on the 6th of March, 1860, and procured a foreclosure of the mortgage of the company; and the roads, lands, and franchises which it covered were sold pursuant to its provisions, and at the sale were purchased by the State. This purchase took place in October, 1860; and the necessary conveyances were made to the State.  From that time until the 4th of March, 1864, the State held the property, lands, and franchises thus acquired.  During this period, it made repeated efforts to induce other parties to undertake the enterprises and carry them to completion, but without success.

On the 4th of March, 1864, the legislature passed an act by which two new companies were organized, — one with the same name as the original company, the Southern Minnesota Railroad Company; and the other by the name of the Minnesota Valley Railroad Company.  The name of this latter company was afterwards changed to that of the St. Paul and Sioux City Railroad Company.

To the companies thus organized the legislature granted, subject to certain conditions, all the property, rights, and franchises of the original company which the State had acquired, " free from all claims and liens : " those which appertained to one of the lines were granted to the new Southern Minnesota Railroad Company; those which appertained to the other line were granted to the Minnesota Valley Railroad Company, now the St. Paul and Sioux City Railroad Company.  The condi-

tions annexed to the grants were complied with, and the grants accepted. These new companies soon afterwards commenced the construction of their respective roads, and had, at the commencement of this suit, nearly completed them. The Southern Minnesota Railroad Company had constructed and equipped one hundred and sixty-seven miles of its road, at an expenditure of $5,000,000; and the St. Paul and Sioux City Railroad Company had constructed and equipped one hundred and seventy miles of its road, at an expenditure of $3,000,000.

Upon the completion of ten miles of its road, each company received from the governor, pursuant to the provisions of the act, a deed in fee-simple of one hundred and twenty sections of land appertaining to its road, to which the State was entitled under the congressional grant, and the bonds of the original Minnesota company transferred to the treasurer of the State were cancelled.

Pending these proceedings, the bonds of the State in the hands of the complainant remained unpaid, and they are still unpaid. The faith of the State, solemnly pledged for the payment of both principal and interest, has never been kept. So far from keeping it, the State, as early as November, 1860, adopted an amendment to its constitution, prohibiting any law, which levied a tax or made other provision for such payment, from taking effect until the same had been submitted to a vote of the people and been adopted by them. This prohibition, if not a violation of the State's pledge, conflicts with its spirit. The bonds issued are legal obligations. The State is bound by every consideration of honor and good faith to pay them. Were she amenable to the tribunals of the country as private individuals are, no court of justice would withhold its judgment against her in an action for their enforcement.

The complainant, under these circumstances, finding no relief from the pledged faith of the State, and unable to pursue any remedies at law against her on the bonds, seeks to charge with their payment the two hundred and forty sections mortgaged by the company under the amendment of 1858 and purchased by the State under the foreclosure of the mortgage, and now held by the defendant railroad companies.

*Mr. Gordon E. Cole* and *Mr. W. M. Evarts* for the appellant.

The position of the State in relation to the bonds is that of an accommodation maker of negotiable paper. She is simply a surety. The original Southern Minnesota Railroad Company which indorsed the bonds is the principal debtor. Hence, upon the doctrine of subrogation, the conveyance by that company of any property to the State, to indemnify her, creates a trust in favor of the holder of the bonds, and appropriates the property so conveyed as a fund for the payment of them. 1 Lead. Cas. in Eq. 163, 164; 1 Story, Eq., sects. 502, 638.

The bonds are valid obligations, and the defendants are affected with notice of the facts on which the complainant bases his claim. He is not estopped by any act or laches from maintaining his suit.

*Mr. E. C. Palmer* and *Mr. James Gilfillan, contra.*

As between the State and the holder of the State bonds, the State is the principal debtor, and primarily liable; and there is no ground for the application of the doctrine of subrogation.

The defendant companies are purchasers in good faith without notice.

The complainant is estopped by his own actions from making his claim, and is not entitled to relief by reason of laches.

MR. JUSTICE FIELD, after making the foregoing statement of the case, delivered the opinion of the court.

The position of the complainant is, that, notwithstanding the form of the contract, the original company was, in fact, the principal debtor, and the State its surety; and that, as the creditor to be paid, he is entitled to have the securities taken by the State applied to the payment of the bonds held by him; that the one hundred and twenty sections for each road, which the company was authorized to construct, became its property by the act of May 22, 1857; that the subsequent interest of the State under the trust-deed and mortgage was only the right to hold them as security against loss upon its bonds; that this interest was not changed by the foreclosure of the mortgage and purchase of the State at the sale; and that the lands passed to the defendant railroad companies with notice that they were thus held by the State.

The general doctrine, that a creditor has a right to claim the benefit of a security given by his debtor to a surety for the latter's indemnity, and which may be used if necessary for the payment of the debt, is not questioned. The security in such case is in the nature of trust-property, and the right of the creditor arises from the natural justice of allowing him to have applied to the discharge of his demand the property deposited with the surety for that purpose if required by the default of the principal. In this case, the deed and mortgage to the State were not intended to create a trust in favor of the holders of her own bonds. The State was primarily liable to the bondholders; and it was only as between her and the company that the relation of principal and surety existed. It may be doubted whether the bondholders could call upon the company in any event. The indorsement made by the president simply transferred the bonds: it was not the act of the company. Be that as it may, whatever right the plaintiff had to compel the application of the lands received by the State to the payment of the bonds held by him, it was one resting in equity only. It was not a legal right arising out of any positive law or any agreement of the parties. It did not create any lien which attached to and followed the property. It was a right to be enforced, if at all, only by a court of chancery against the surety. But, the State being the surety here, it could not be enforced at all, and, not being a specific lien upon the property, cannot be enforced against the State's grantees.

Where property passes to the State, subject to a specific lien or trust created by law or contract, such lien or trust may be enforced by the courts whenever the property comes under their jurisdiction and control. Thus, if property held by the government, covered by a mortgage of the original owner, should be transferred to an individual, the jurisdiction of the court to enforce the mortgage would attach, as it existed previous to the acquisition of the government. *The Siren*, 7 Wall. 158, 159. But, where the property is not affected by any specific lien or trust in the hands of the State, her transfer will pass an unincumbered estate.

But aside from this consideration, which of itself is a suffi-

cient answer to the present suit, the long delay of the complainant in asserting any claim to the lands in controversy, whilst the defendants were constructing, at a vast expenditure of labor and money, their railroads, deprives his suit of favorable consideration.  It does not appear that for twelve years after the abandonment of work by the original Minnesota Company on the roads, the grading of which it commenced, he set up any claim such as is advanced in this suit: on the contrary, it is abundantly established that in various ways he urged upon members of the legislature the adoption of measures for the construction of the roads, which involved an appropriation by the State for that purpose of the lands in controversy; and that after the new companies were organized, and the lands were granted to them, he urged them to proceed with the enterprises, knowing that upon those lands they relied to carry on the works.  Under these circumstances, it would be manifestly inequitable and unjust to grant his prayer.

The conclusion we have reached renders it unnecessary to consider the effect of the alleged forfeiture, declared by the State, upon the interest of the company in the lands.

*Decree affirmed.*

MR. JUSTICE STRONG dissented.