STEVENS and others *v.* THE LOUISVILLE & NASHVILLE RAIL-
ROAD Co., and fifteen other suits on behalf of
bond holders, against fifteen other
railroad companies.

*(Circuit Court, M. D. Tennessee.* September 25, 1880.)

1. STATE BONDS—STATUTORY LIEN—PURCHASER—INTERNAL IMPROVE-
   MENTS—TENNESSEE STATUTE—ACT OF FEBRUARY 11, 1852—CON-
   STRUCTION.—The purchaser of negotiable state bonds sold in open
   market, without indorsement or guaranty, and issued to a railroad
   under the "Internal Improvement Act of the State of Tennessee," for
   the ironing and equipping of the said railroad, has no enforceable
   right, by contract or otherwise, in the statutory lien vested in said
   state by said internal improvement act, against the road and equip-
   ments of said railroad, for the purpose of enforcing the payment of
   the principal and interest of said bonds at maturity.

In Equity.

Some of these suits are pending in the eastern, some in
the middle, and others in the western district of Tennessee.

These are suits in equity pending in the circuit courts of
the United States for the districts of Tennessee, brought by
complainants, on behalf of holders of internal improvement
bonds of the state of Tennessee, against various railroad com-
panies to whom the bonds were issued, to aid in the construc-
tion of their several lines of railroads, and against all other
persons interested.    They were argued together in April and
May last, at Nashville.    The object of the suits is to have a
lien in favor of the bond holders declared and established
upon the railroads of the several defendant companies, and
a receiver appointed for the collection of the accrued and
accruing interest, the interest having been in default since
July 1, 1875.    The principal is not due.

The plaintiffs' contention is, briefly, that the acts passed by
the legislature of the state of Tennessee in 1852, to grant aid
to the railroad companies by a loan to them of the bonds of the
state, imposed a lien upon the railroads, as security to the
holder of the bonds and to the state.    Payment to the holder
would operate as indemnity to the state.    Inasmuch as the
v.3,no.12—43

state and the companies are in default in the payment of the interest since July, 1875, the bond holders by these suits seek to have a lien in their favor established upon the roads.

The general assembly of the state of Tennessee passed, February 11, 1852, an act known as the "Internal Improvement Act of the State of Tennessee," extending aid to railroad companies by a loan of state bonds, the proceeds to be used in ironing and equipping the roads. Prior to the time of passing the act there had been issued state bonds for various purposes, of which above $3,500,000 was outstanding. The state of Tennessee was now in good credit. Her 6 per cent. bonds brought a premium in the money markets of the world, as did also, subsequently, her bonds issued to the defendant railroad companies under the act in question, and acts amendatory thereof, which bonds are the subject of controversy in these suits. The scheme of internal improvement now adopted was to issue to each company 6 per cent. bonds to the amount $8,000 per mile, in instalments,—afterwards extended to $10,000,—the first when a section of 30 miles of road was completed ready for the ties, and the subsequent instalments upon completion of each additional section of 20 miles; afterwards changed to 10 miles. The bonds are transferable by delivery, run not less than 30 nor more than 40 years from the respective dates of issue, the interest matures semi-annually, and, with the principal, is payable in New York. They were paid to the railroad company, and sold in open market, without indorsement or guaranty. The state was invested by the terms of the statute with a lien upon each section of the company's road as soon as the bonds for that section were issued, and upon final completion of the road such lien was to attach to the entire road and its equipments. The company was to be incapable of creating any lien conflicting with that in favor of the state.

The amount of the lien claimed by complainants in behalf of such bond holders upon all the railroads is about $15,-000,000. The litigation, however, affects the holders of between $30,000,000 and $35,000,000 of other mortgage bonds secured upon these roads, and issued under authority of the

general assembly, conferred in 1869–70, to enable the aided companies to repay to the state the bonds loaned to them. The holders of the last-mentioned bonds claim to have a first lien upon the roads, and appear in these suits, with the defendant companies, to contest the lien claimed by complainants and their associate bond holders.

The interest of the state debt was in default from July, 1861 to 1866, during the civil war, when the price of her bonds had depreciated in value to less than 50 per cent. of their face. The storm of war left the railroads of the state without money, credit, or rolling stock, and their roads and bridges going to decay. The first legislature of Tennessee, after the storm had passed, assembled in 1865, when the state and the railroad companies were alike in a condition of bankruptcy. Provision was now made by the state to fund all her overdue bonds and interest coupons outstanding into new bonds. In 1866 and 1867 the state issued additional bonds to some of these railroad companies to aid them to build bridges and repair their roads, the state reserving a lien, and imposing terms and conditions like those in the act of 1852, but somewhat modified.

In 1869–70 none of the principal of the railroad aid bonds issued under the acts of 1852, or acts amendatory thereof, had matured, but now the general assembly of the state, to enable the respective companies to repay any part of the principal of their indebtedness for bonds loaned to them, passed an act permitting payment in any of the outstanding bonds of the state.

To obtain money to purchase state bonds for surrender, they were severally authorized to issue mortgage bonds upon their respective roads and equipments, corresponding in denomination with the state aid bonds, and deposit them with the comptroller of the state, to be by him delivered to the company or its agent whenever and as Tennessee state bonds were by the company surrendered and cancelled. These mortgage bonds were by law declared to be a first lien on the road and equipments of the company issuing them, and as evidence to the purchaser the comptroller was required to and

did certify upon each bond that it was "secured by first mortgage."

Many of the companies availed themselves of this legislation, and under its sanction and authority an aggregate of between $30,000,000 and $40,000,000 of such mortgage bonds were by the companies issued and sold, and are now outstanding.

Other railroad companies did not avail themselves of the provisions of the law of 1869–70. They continued to be in default as to the payment of interest, and as to payment annually into the sinking fund required by statute. Proceedings by the state were therefore commenced in the state court of chancery, and decrees of foreclosure and sale obtained.

At the sale the state was purchaser. These foreclosed roads were subsequently sold by the state and new companies organized. Payment by the purchaser was made to the state in any outstanding Tennessee state bonds, at their face value, and the purchaser was invested with all the right and title of the state.

The state, as before stated, had funded her overdue bonds and interest coupons into a new bond, under the law of 1865, and in February, 1870, another act was passed to again fund unpaid interest that had accrued on the public debt, together with the floating debt of the state, and all that might become due up to 1874. Holders of Tennessee bonds, including holders of internal improvement bonds issued to railroad companies, generally accepted the provisions thus made for retiring overdue interest coupons, as they had done under the act of 1865. The state of Tennessee, however, again defaulted in her interest January 1, 1875, and subsequently openly repudiated her bonded debt, for the payment of which the faith and credit of the state were solemnly pledged.

The internal improvement act of February 11, 1852, will alone be referred to, as it contains all the provisions necessary to be considered. The lien is declared by the third section, which is as follows: "That so soon as the bonds of the state shall have been issued for the first section of the road as aforesaid, they shall constitute a lien upon said section so

prepared as aforesaid, including the road-bed, right of way, grading, bridges, and masonry, upon all the stock subscribed for in said company, and upon said iron rails, chairs, spikes, and equipments, when purchased and delivered; and the state of Tennessee, upon the issuance of said bonds, and by virtue of the same, shall be invested with the said lien or mortgage without a deed from the company, for the payment by said company of said bonds, with the interest thereon as the same becomes due."

The requirement, by section 5, as to the payment of interest, is that 15 days before it falls due, the company shall deposit in the bank of Tennessee—the state's fiscal agent—"an amount sufficient to pay such interest, including exchange and necessary commissions, or satisfactory evidence that said interest has been paid or provided for, and if said company fails to deposit said interest as aforesaid, or furnish the evidence as aforesaid, it shall be the duty of the comptroller to report that fact to the governor," who is immediately to put the road into the hands of a receiver, to operate it in behalf of the state until the default is made good, and then to surrender the road to the company.

By the section "the comptroller is authorized, and it is made his duty, upon his warrant, to draw from the treasury any sum of money necessary to meet the interest on such bonds as may not be provided for by the company, as provided for in this act, and the comptroller shall report thereof to the general assembly from time to time."

The requirement as to the payment by the company of the principal of the bonds by section 7 is "that, at the end of five years after the completion of said road, said company shall set apart 1 per centum per annum upon the amount of bonds issued to the company, and shall use the same in the purchase of bonds of the state of Tennessee, which bonds the company shall pay into the treasury of the state, after assigning them to the governor, and for which the governor shall give said company a receipt; and, as between the state and said company, the bonds so paid in shall be a credit on the bonds issued to the company; and bonds so paid in, and the

interest accruing thereon, from time to time, shall be held and used by the state as a sinking fund for the payment of the bonds issued to the company; and should said company repurchase any of the bonds issued to it under the provisions of this act, they shall be credited as aforesaid and cancelled. And should said company fail to comply with the provisions of this section, it shall be proceeded against as provided in the fifth section of this act," viz., as in case of failure to meet instalments of interest. It will be noticed that, as these bonds were to be issued in instalments at different periods, they would therefore fall due at different times.

The sixth section provides "that if said company shall fail or refuse to pay any of said bonds when they fall due, it shall be the duty of the governor to notify the attorney general of the district in which is situated the place of business of said company, of the fact; and thereupon said attorney general shall forthwith file a bill against said company in the name of the state of Tennessee, in the chancery or circuit court of the county in which is situated said place of business, setting forth the facts, and thereupon said court shall make all such orders and decrees in said cause as may be deemed necessary by the court to receive the payment of said bonds, with the interest thereon, and to indemnify the state of Tennessee against any loss on account of the issuance of said bonds, by ordering the said railroad to be placed in the hands of a receiver, ordering the sale of said road, and all the property and assets attached thereto or belonging to said company, or in such other manner as the court may deem best for the interest of the state."

By section 12 "the state of Tennessee expressly reserves the right to enact by the legislature thereof, hereafter, all such laws as may be deemed necessary to protect the interest of the state, and to secure the state against any loss in consequence of the issuance of bonds under the provisions of this act, but in such manner as not to impair the vested rights of the stockholders of the companies."

Complainants contend that the statutory lien is to be regarded as an instrument of security taken for the benefit of

the bond holders; or, more fully stated, that the legislation and action of the state under it were effectual to fix upon the railroads respectively a lien not merely for the indemnity of the state of Tennessee, but also to secure the payment of its bonds to their holders; that the state became trustee of this lien for the benefit of the holder of the bonds, which lien inured to their benefit as *cestuis que trustent* of the state, by force of the express contract to that effect in the law creating the security, as well as by necessary legal implication from the relations of the parties, which no subsequent dealings between the railroad companies and the state could discharge. Again, it is said "the first or primary object of the act was to compel each aided company to pay its debt directly to its true creditor, the lender on the bonds. This was effected by the usual and proper process—a lien pure and simple for the payment of the bonds upon the estate of each aided company, enforceable in equity in case of default."

On the other hand, defendants' answers state the opposing view thus: "That the said statutory mortgage was taken by the state in its own behalf, and for its own benefit, and not as trustee for its bond holders, and that said statutory mortgage was conditioned solely for the payment by the company to the state of the company's indebtedness to the state for the bonds loaned to it, and in respect of both principal and interest such payment was conditioned to be made by the company to the state before the corresponding amount of interest or principal would become due or payable by the state to the holders of the state bonds; * * * that by the statute two entirely independent and distinct debts were created,—one from the state to the bond holders upon its bonds payable to bearer, resting upon the faith and credit of the state; the other, an indebtedness from the railroad company to the state for the amount of the state bonds loaned to it,—and that the statutory mortgage was given to secure this latter direct obligation from the railroad company to the state, with which the bond holders had no connection or concern."

It is further said that whether the engagement of the company was to pay to the state or to holders of the bonds is not

important, and that if, under the terms of the act, it shall be held that the companies were to make payment to the bond holders, such payment was to be merely in relief of the state from the ultimate performance of its obligation, but all the while the obligation of the state remained was to be in exoneration of the state, but did not modify its undertaking on the bond, and created no privity between the bond holders and the company; that such an undertaking by the company would be to indemnify the state by payment of the bond in its stead, and that the obligation was to the state alone, and one in which no one else had, or was intended to have, any legal or equitable interest, much less any direct participation and right of intervention or control; that the relation between the railroad company and the holder of state bonds was that merely of vendor and purchaser of negotiable securities, passing by delivery and without indorsement, and therefore created no relation between them of debtor and creditor.

Edward L. Andrews, George Hoadly, Charles O'Connor, Samuel Watson, and T. S. Webb, for complainants.

C. F. Southmayd, Stanley Matthews, Edward H. East, Edward Baxter, Wm. Baxter, W. Y. C. Humes, B. M. Estes, J. B. Heiskell, R. McP. Smith, Smith & Allison, and Jas. T. & John K. Shields, for defendants.

WITHEY, D. J.   I cannot refrain from expressing personally and officially my acknowledgements for the complete and exhaustive arguments by learned and eminent counsel which distinguished the hearing and submission of these important cases.   I approach their consideration with all the aid which the most consummate and elaborate arguments can afford. The opinion will not extend over all the debated ground.

Have the holders of internal-improvement bonds, loaned by the state of Tennessee to a railroad company, under the act in question, any enforceable right, by contract or otherwise, in the statutory lien that is reserved to the state of Tennessee for the payment of the principal and interest of the bonds as they matured?   Section 3 provides "that so soon as the bonds of the state shall have been issued for the first section of the road as aforesaid, they shall constitute a lien upon

said section, * * * and the state of Tennessee, upon the issuance of said bonds, and by virtue of the same, shall be invested with said lien * * * for the payment by said company of said bonds, with the interest as the same becomes due."

This section of the statute relates only to the first division of 30 miles, but the lien there declared is by another part of the act applied and extended to each additional section of 20 miles as fast as completed, and finally to the entire road, as security "for the payment of all bonds issued to the company." Section 4.

The lien upon the property of the company was effected by virtue of the statute upon the issue of the bonds by the state and their acceptance by the company. Unless an intention of the legislature to secure the purchaser of the bonds can be implied from the act and the dealing of the parties, the claim of complainants to the relief asked in these suits rests upon a mere equity. There is no denial that it was the state of Tennessee which was invested with the lien, but it is said that she occupies the position of a surety holding security for the payment of the debt, which security the creditor—the bondholder—can, upon default of the principal debtor,—the railroad company,—avail himself in equity; that default by the company and by the state in the payment of the interest having occurred, the state becomes, and is, a trustee of this lien for the benefit of the bond holder. It was the state and the railroad company that dealt together in this matter. The state dictated the terms upon which it would grant aid, and the company accepted those terms without reference to what the purchaser of the bonds would say or claim. The bonds were loaned by the state, and passed over to the company to be sold for money to aid or accommodate the company. The bonds were accepted by the company upon the understanding and agreement (1) that the state was invested with a lien upon the company's railroad and property to secure "the payment by said company of said bonds, with the interest thereon as the same becomes due;" (2,) that the interest should be paid by the company to the financial agent of the

state at least 15 days before it should become due, or satisfactory evidence be produced that it had been paid or provided for; and (3) that the principal of the bonds should be paid by the company by means of a sinking fund in the state treasury, created by the purchase and deposit therein of Tennessee interest-bearing bonds, supposed to be adequate for the purpose of enabling the state to meet its bonds at maturity.

There is nothing in any of these stipulations out of which the relation of the state to the bond holder is changed from that of a principal debtor to a surety; nor does it appear how the company becomes debtor to the bond holder in any degree whatever. There is no express promise on its part to the bond holder, nor is any contract relation implied between him and the company. Section 3 contains no language importing such promise. It declares merely that the state. of Tennessee shall be invested with a lien for the payment of the bonds by the company. The state imposes the lien if its aid is accepted and as a condition of the grant. The language may imply a promise by the company accepting the aid to pay the state, but there is no obligation of the company to pay the bond holder resulting either from positive law or from contract express or implied.

The lien was clearly "reserved in favor of the state." It was the state of Tennessee that, upon the issuance of the bonds, was invested with the lien or mortgage without deed. No other lien could have priority over or come in conflict with the lien of the state. The company was to deposit the interest money and exchange with the state's fiscal agent at least 15 days before it became due, or satisfactory evidence that the interest had been paid or provided for. All the suits and proceedings under the act are given as remedies exclusively to the state. The state might have a decree and sell the road for non-payment of any bond. The bond was made by the state for the accommodation of the railway company, and was sold in open market, without any promise by the company other than what is implied to the state by accepting the benefit of the act.

There is no express declaration of trust on the part of the

state. It is sought to raise a trust out of the language of the act, and the principle is invoked applicable to a security given by a debtor to his surety conditioned that it shall be void if the mortgagor pays the debt on which the mortgagee is surety, viz.: that in such case the mortgage will be held both as an indemnity to the surety and as a security for the debt; the surety being regarded in equity as trustee for the benefit of the creditor, and as having no right to discharge or defeat the trust, unless it be to a purchaser for a valuable consideration, without notice. The rule is not questioned. But it is not conceived that this rule would control the express terms of a mortgage or other instrument of security, nor render wholly nugatory the effect of an express reservation of a right of disposition of the mortgaged property by the mortgagee, as is provided in the statute under consideration.

It is not within the province of equity to import conditions into the mortgage. The conditions of this statutory lien were that the company should deposit the interest money and exchange with the state's fiscal agent, or furnish evidence of prior payment, and should also pay into the treasury the means of providing a sinking fund for the ultimate payment of the bonds. This dealing was to be with the state,—as to the payment of the principal it must have been; as to the payment of interest it was optional with the company,—and there being no express covenant by the company, a compliance with the conditions named in the mortgage would discharge the lien.

We do not overlook a claim made by one of complainants' counsel that the intention of the legislature is to be ascertained by the language of the statute declaring the lien, but we think the statute must be construed together, and that the requirements put upon the mortgagor—the conditions of his mortgage, when read in connection with the declaration, many times repeated in the statute, that the lien is the lien of the state—should have great weight in determining the legislative intention. The meaning of the legislation is to be declared from the words and subject-matter of the statute. It is the scope and meaning of the whole enactment, rather than

the literalism of words and phrases, that are to govern. The signification of the entire act, and not a single clause, determines the intention of the law-maker. Thus, section 6, considered with other provisions of the act, is important as reserving to the state the right, through proceedings in court, to sell the road, thereby discharging it from the lien imposed by the statute.

The fact that the state might discharge the lien in such way imports that there was no intention of the law-makers to give a beneficial interest in the security to any one but the state. This view applies with peculiar force where the holder of the security is a state, not amenable to the ordinary process of courts.

This view of the effect of section 6 upon the construction as to the legislative intent is not weakened, but fortified, by section 14, which declares that "in the event any of the roads shall be sold under the provisions of the act it shall be the duty of the governor to appoint an agent for the state to attend the sale, and, if necessary, to protect the interests of the state, buy in the road in the name of the state; and, in case the state shall be the purchaser, the governor shall appoint a receiver, who shall take possession of the road and property, and use the same as provided for in the fifth section of this act, and said receiver shall settle his accounts semi-annually with the comptroller, until the next meeting of the general assembly."

This section imports three things at least as to a sale: (1,) a third person may be a purchaser; (2,) the state may be the purchaser; (3,) that the purchaser obtains a title discharged of the lien. It is manifest that if a stranger buys he takes title freed from all liens imposed by the act upon the property, and there is nothing in the language of the section or in the act to indicate that the state, becoming purchaser, does not take the property equally free from such lien.

The receiver appointed by the governor is to take possession of the road and "use the same as provided for in the fifth section;" that is, in like manner, viz.: "run the same and manage the entire road." This he is to do until the next

meeting of the general assembly, when by clear implication the future management or disposition of the road is left to legislative action.

The contract between the state and the company is that the state shall have a lien "for the payment by said company of said bonds," but it is nowhere required by the state, and therefore not assented to by the company, that the latter shall pay *to the bond holder.* It was urged that this language imports payment by the company to the only person then entitled to ask or enforce it. The language must, however, be understood to relate to other parts of the statute, which prescribes specifically the manner of payment by the company, viz.: payment annually into the state treasury of a sum to be employed as a sinking fund.

It is made optional, by section 5, with the company whether it will deposit the interest as it becomes due with the fiscal agent of the state, or pay the same to the bond holder; and by section 7 the principal was to be paid by setting apart annually, after five years from the completion of the road, a certain per centum of the amount of bonds issued to the company, invested in any bonds of the state and assigned to the governor. This sinking-fund provision would, within the period which the bonds had to run, place in the treasury of the state an amount sufficient to nearly or quite enable the state to pay the bonds. The Tennessee bonds were generally 6 per cent., and funded in those the time required would be 33 years and two months.

There is nothing in the act to indicate that after the company has complied with these provisions as to interest and sinking fund, and has thus provided the state with the means of payment, that the company was also required to pay to the bond holders. Certainly this was not the condition of the security, as the only way in which a default could occur was by failure of the company to provide for payment of the interest and principal in those specified ways.

But it is said the sinking fund was not to be commenced until five years after the particular road should be completed, and that that event might not take place at all, or not till half

or more of the time which the bonds had to run had expired, so that the period might be wholly inadequate in which to provide a sufficient sinking fund for paying the bonds when due, and that this indicates that the lien was not intended as security merely for payment by the company to the state by means of a sinking fund in the manner provided. A statute must be construed from the stand-point,—the circumstances and surroundings of the law-makers,—when it was enacted; and it would be unjust and repugnant to reason and common experience to assume that the legislature passed the act in the expectation that the roads would never be finished, or would not be completed within a reasonable time. Besides, section 12 reserved to the state ample powers to make such modifications in relation to the time for the sinking fund to commence, and the per cent. annually to be paid into that fund, as would fully protect the interests of the state against delay on the part of the railroad company.

Whatever might be said in regard to the evidence adduced in these cases of contemporaneous construction, through the utterances of state officials in public documents, the action of any department of the state government, or otherwise, there is, in the judgment of the court, nothing to change the views which have been expressed.

*Chamberlain* v. *St. P. & S. C. R. Co.*, 92 U. S. 299, was decided upon a statute and upon facts similar to those in the present cases, and is very instructive. The state of Minnesota, by a constitutional amendment, provided for an issue of its bonds as a loan to the Southern Minnesota Railroad Company, and required such company to convey the lands in question "in trust for the better security of the treasury of the state from loss on said bonds," and further provided that if the borrowing company should make default in payment of either the principal or interest of the bonds issued by the state, the governor should proceed to sell the lands held in trust by the state. The company accordingly executed a trust conveyance of the lands to the state, conditioned for the payment of the principal and interest of the bonds issued to that company. The company made default in the payment of interest.

The state foreclosed and became the purcasor of the lands, which she granted to another corporation, the defendant in the Chamberlain suit. Chamberlain was holder of some of the state bonds, the payment of which was secured by the trust conveyance, and sought to have a lien upon the land declared in his favor.

In the case at bar, as in that case, the state was primarily liable to the holder of the bonds. In the case at bar, as in that case, the state reserved to itself the right of foreclosure and disposition of the property. In deciding that case, Justice Field, after stating the position of the complainant, viz., "that the interest which the state took under the trust deed and mortgage was only the right to hold them as security against loss upon its bonds; ❋ ❋ ❋ that this interest was not changed by foreclosure of the mortgage and by purchase of the property by the state," uses the following language: "The state was primarily liable to the bond holders, and it was only between her and the company that the relation of principal and surety existed. It may be doubted whether the bond holders could call upon the company in any event. The indorsement made by the president simply transferred the bonds; it was not the act of the company. Be that as it may, whatever right the plaintiff had to compel the application of the lands received by the state to the payment of the bonds held by him, it was one resting in equity only. It was not a legal right arising out of any positive law or any agreement of the parties. It did not create any lien which attached to and followed the property. It was a right to be enforced, if at all, only by a court of chancery against the surety. But the state being the surety here it could not be enforced at all, and, not being a specific lien upon the property, cannot be enforced against the state's grantees."

This was said to be the law of that case, even if the bond holders could have called upon the company for payment. But, laying this feature aside, the analogies are as before stated, and whatever right the plaintiffs have to claim benefit from the security rests here, as in that case, as a mere equity. There was no legal right, because the law did not impose one,

and the company made no promise to the bond holder. Such equity created no lien which followed the property; the liability of the state was to the bond holder. She held no relation as surety to him; as in the Chamberlain case, it was only as between her and the company that in any possible view the state could be regarded as surety, and this view would make it necessary to treat the company as the principal debtor to the bond holder, whereas the company was not the principal debtor, nor, indeed, a debtor to the bond holder in any degree.

The reasoning in the case of *Hand* v. *Railroad Co.*, in the supreme court of South Carolina—manuscript—referred to on the argument, cannot all be adopted as applicable to these cases, if the conclusions might be.

It is not upon its fact authority. The railroad company made its own bonds, and the state guarantied their payment to the holder by indorsement. The state was secured by a lien upon the company's road, reserved by the statute which authorized the guaranty. As a surety, the state assumed contract obligations to the creditor—the bond holder. If a creditor has a right to claim the benefit of security given by the debtor to his surety for the latter's indemnity, it does not follow that the right exists where the principal debtor takes the security from the accommodatee, and where the security holder holds no other relation to the creditor than that of debtor, and the giver of the security is neither a debtor nor surety to the creditor.

It becomes unnecessary to further consider the effect of the reservation of power to the state under section 12. The court has already stated that such reserved power is ample to authorize a modification of the sinking-fund provisions, as has been done by increasing the amount to be paid annually into the sinking fund and changing the time for such payment to commence.

It follows that by this judgment neither the foreclosed nor the non-foreclosed roads are subject to any lien in favor of the holders of internal improvement bonds issued by the state of Tennessee, under the acts passed by that state, and to

which reference has been made. Other topics presented in the arguments need not be considered.

A decree will be entered in each case dismissing the bill of complaint therein, with costs to defendants, and it is directed that such decrees be drawn and presented for approval.