# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

## FIRST NATIONAL COMPANY V. STATE-PLANTERS BANK AND TRUST COMPANY, TRUSTEE.

June 13, 1935.

Present, All the Justices.

The opinion states the case.

*Christian, Barton & Parker,* for the appellants.

*J. H. Rives, Jr., Leake & Buford, Littleton M. Wickham* and *Percy S. Stephenson,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

By deed dated July 1, 1925, and recorded on September 3, 1925, Edwards-Slaughter Company, Incorporated, conveyed to State and City Bank and Trust Company, now State-Planters Bank and Trust Company, as trustee, certain land, with the plant and equipment thereon, in Northumberland county, Virginia, to secure the payment of certain bonds in the aggregate principal sum of $60,000 with interest. This deed of trust likewise pledged as additional security for the payment of the bonds a note for the sum of $20,000, secured by a maritime mortgage on the S/S "M. M. Davis," dated September 2, 1925, from the Edwards-Slaughter Company to the same bank as trustee.

In accordance with the terms of the deed of trust the First National Company of Baltimore (hereinafter sometimes called the "Guaranty Company"), by appropriate endorsements on each bond, guaranteed the payment of the principal and interest of the $60,000 of bonds.

By the deed of trust Edwards-Slaughter Company agreed to carry not less than $50,000 fire insurance on the plant and equipment, and not less than $20,000 fire and marine insurance on the S/S "M. M. Davis." Under the maritime mortgage Edwards-Slaughter Company was likewise obligated to insure the steamer for not less than $20,000. Such insurance was provided, and, in accordance with terms of the deed of trust, the policies were endorsed to the bank trustee as additional security for the debt.

The deed of trust further provided that all proceeds collected from fire and/or marine insurance should be treated in the same manner as proceeds derived from a foreclosure sale, that is, the net proceeds thereof were to be applied to the payment of the bonds and interest thereon, and the surplus, if any, returned to the debtor or its assigns.

Beginning with January 1, 1927, and from time to time, the First National Company paid four instalments of interest, amounting to $7,204.50, on which Edwards-Slaughter Company had defaulted, and made other advances for insurance, crew's wages, taxes, etc., amounting to an additional sum of $15,803.33. No part of these advances have been repaid to the First National Company.

On September 18, 1927, the S/S "M. M. Davis" was totally destroyed by fire and the net proceeds of the insurance thereon, amounting to $58,256.67, were paid to the bank as trustee under the maritime mortgage pending a determination of the disposition thereof, because, in the meantime, Edwards-Slaughter Company had become indebted to numerous general creditors other than the First National Company and the bondholders.

The trustee bank, being uncertain what disposition to make of the insurance moneys, on February 13, 1928, filed a bill in chancery in the Circuit Court of Northumberland county, asking the guidance and protection of the court in the distribution of the same.

In its answer the First National Company requested that all of the proceeds from the fire insurance be paid to the bondholders, while the general creditors insisted in their

answers that only $20,000 of the insurance moneys should be paid to the bondholders, and that the excess of $38,256.67 be distributed among the general creditors of the Edwards-Slaughter Company. While none of the bondholders answered the bill in person, subsequently they formed a protective committee with full power to act. Although this committee does not appear to have been formally made a party defendant to the cause, its existence was recognized in the subsequent decrees, particularly those in which certain distributions were made by consent of its counsel.

On September 29, 1928, the special commissioner, to whom the matter had been referred in due course, filed his report in which he found, among other matters, that all of the insurance money belonged, and should be paid, to the bondholders.

In the meantime, on August 4, 1928, the Edwards-Slaughter Company was adjudicated a voluntary bankrupt and the trustees in bankruptcy enjoined further proceedings in the State court, claiming that the funds should be administered in bankruptcy. On May 1, 1931, the Circuit Court of Appeals for the Fourth Circuit decided in *State-Planters Bank and Trust Company* v. *Parker*, 50 Fed. (2d) 156, 157, that the funds should be returned to the Circuit Court of Northumberland county to the end that it might "proceed to determine the rights of the claimants in the fund and direct its disposition."

Thereafter the trustees in bankruptcy of Edwards-Slaughter Company were made parties to the chancery suit in the State court and filed an answer alleging that the bondholders were entitled to receive only $20,000 of the insurance moneys, and that the remaining $38,256.67 belonged to the trustees in bankruptcy for distribution in that forum. They also filed exceptions to the commissioner's report of September 29, 1928, for the same reasons.

In the meanwhile, in the spring of 1930, the First National Company itself had become insolvent and its affairs had been placed in the hands of Maryland receivers, who claimed that they were entitled, as a general creditor of Edwards-

Slaughter Company, to receive a dividend on the sum of $23,007.83, which had been advanced by the Guaranty Company to Edwards-Slaughter Company to pay interest, taxes, insurance, wages, etc. The bondholders, on the other hand, claimed that by reason of the inability of the First National Company to make good its guaranty on the bonds, such dividend as the Guaranty Company would otherwise have received should be paid to them, the bondholders.

The court having considered various exceptions to the commissioner's report of September 29, 1928, decided and on April 1, 1932, decreed as follows: (Italics supplied.)

"Upon consideration whereof, the court being of opinion that the exceptions filed herein on October 23, 1931, of State-Planters Bank and Trust Company, trustee, complainant herein, and of the trustees in bankruptcy of the estate of the said Edwards-Slaughter Company, Incorporated, to the report of Special Commissioner R. O. Norris, Jr., dated September 14, 1928, and filed in the office of the clerk of this court on September 29, 1928, are to the extent hereinafter set out, well taken, doth to such extent sustain the same and in all other respects, except as the said report is hereinafter modified, doth confirm the same, and proceeding further to adjudicate the principles of this cause so far as it is now appropriate to do so, doth adjudge, order, and decree:

"1. That the said trustees in bankruptcy are *not entitled to a lien* upon any part of the proceeds of the fire insurance upon the steamer 'M. M. Davis' now in the hands of the complainant.

"2. That the said proceeds shall be applied as follows:

"First: To the payment of all expenses and charges incurred by the complainant in the prosecution and protection of its rights under a certain deed of trust and a certain preferred maritime mortgage dated, respectively, July 1st and September 2, 1925, in both of which the said Edwards-Slaughter Company, Incorporated, was grantor and the complainant was grantee and trustee, * * * including reasonable compensation for the services of the complainant and

of its counsel and the costs of this suit so far as the same have not already been paid;

"Second: To the discharge of the note for $20,000, secured by the said preferred maritime mortgage, with the interest thereon accruing from July 1, 1930, which said note is held by the complainant as trustee for the holders of the bonds secured by the said deed of trust dated July 1, 1925;

"Third: To a ratable distribution among the general creditors of the said Edwards-Slaughter Company, Incorporated."

In the same decree the court re-referred the cause to the special commissioner with directions to report a scheme of distribution of the moneys to which the general creditors of Edwards-Slaughter Company, including the bondholders, were entitled, and also to determine whether the bondholders were entitled to the dividend which would otherwise come to the First National Company.

On February 13, 1933, the special commissioner reported that the bondholders, as general creditors of Edwards-Slaughter Company and holders of the guaranty of the First National Company, were entitled to this dividend of $5,-933.20. To this report both the trustees in bankruptcy and the First National Company excepted.

The same report also recommended the payment of certain costs and expenses, and the disbursement to the bondholders of $20,000, that being the amount of the note secured by the maritime mortgage on the S/S "M. M. Davis," as to the disposition of which amount there was no dispute. These disbursements were made.

By a decree entered on December 14, 1933, the court confirmed the report of the special commissioner and decided and decreed that:

"First: The trustees in bankruptcy of Edwards-Slaughter Company, Incorporated, were 'not in law entitled by lien or otherwise' to the excess amount of insurance over and above the $20,000 secured by the preferred mortgage on the S/S 'M. M. Davis'; and

"Second: The holders of the bonds were 'entitled in

equity and good conscience' to the First National Company's dividend of $5,933.20.''

The decree then proceeded to disburse all of the funds in hand except the dividend of $5,933.20 claimed by the First National Company and which the court had decided should go to the bondholders. While the decree specifically provided for a suspension of the distribution of this dividend of $5,933.20 among the bondholders, there was no provision for a suspension of the disposition of the balance of the fund, and it was admitted in the oral argument before us that such balance was distributed and accepted by the parties.

When this appeal was granted to the First National Company from that portion of the decree of December 14, 1933, which directed the allotment of the dividend of $5,933.20 to the bondholders, the bank assigned cross-error to the action of the court in decreeing on April 1, 1932, any part of the fund for distribution to the general creditors of Edwards-Slaughter Company, asserting that the entire insurance fund of $58,256.67 should have been distributed among the bondholders. Likewise the trustees in bankruptcy assigned cross-error to the action of the court in not decreeing, on April 1, 1932, and on December 14, 1933, that the trustees in bankruptcy were entitled to the fund of $38,256.67 (the excess over the $20,000 ship mortgage) for distribution to the general creditors of Edwards-Slaughter Company, Incorporated, in the bankruptcy court.

Both the trustees in bankruptcy and the First National Company have attacked the bank's cross-assignment of error on the ground that the decree of April 1, 1932, of which the bank is complaining, was final as to it and that the bank's appeal therefrom comes too late.

On the other hand, the bank claims that this decree was not final as to it, and just as vigorously asserts that the right of the trustees in bankruptcy to the fund was determined adversely to them in the same decree of April 1, 1932, and that, therefore, the cross appeal of the trustees in bankruptcy comes too late.

Our view of the matter is that the decree of April 1, 1932, was final as to both the bank and the trustees in bankruptcy. Furthermore, it is apparent that these parties, while formally excepting to some portions of the decree of distribution, have acquiesced and participated therein. Especially is this true of the distribution decree of December 14, 1933.

The decree of April 1, 1932, was final as to the bank because it definitely and clearly decided that the bondholders, through the bank, were entitled as lien creditors only to the sum of $20,000 secured by the maritime mortgage on the vessel. It likewise decided that the excess insurance money over and above the $20,000 should be applied, first, to the payment of certain expenses, and then to a ratable distribution among the general creditors of the Edwards-Slaughter Company, Incorporated. This, we think, was a final adjudication, adversely to the bank, that it was not entitled to the excess amount of $38,256.67 now sought to be put in controversy, and hence its appeal through a cross-assignment of error comes too late. *Stowe* v. *Rison,* 152 Va. 842, 148 S. E. 687; *Witt* v. *Witt's Ex'r,* 146 Va. 256, 262, 135 S. E. 681.

Likewise we think the same decree of April 1, 1932, was final as to the trustees in bankruptcy. The answer of the trustees alleged that the excess insurance "belonged to the trustees in bankruptcy for distribution in that forum." It appears from the record that in the oral argument in the lower court preceding the entry of the decree of April 1, 1932, the trustees in bankruptcy asserted that the funds belonged to them by virtue of section 47a (2) of the bankruptcy act, 11 U. S. C. A. section 75a (2), that is, that they were a lien creditor armed with process.

The language in the decree "that the said trustees in bankruptcy are not entitled to a *lien* upon any part of the proceeds, etc.," is but a natural consequence of this argument. However, the decree went further. It not only decided in express language that the trustees were "not entitled to a *lien*" on the fund, but it then proceeded to decree

that the fund should be applied, *first,* to the payment of certain expenses; *second,* to the discharge of the note for $20,000; and, *third,* to a ratable distribution among the general creditors. The trustees had asked the court to give them the fund because, they asserted, they had a *lien* on it. The court denied this claim and proceeded to apportion the fund to the other claimants thereto. Certainly there could have been no more final way of saying that none of the money belonged to the trustees than to say it all belonged to some one else. Hence, we conclude that the decree was final as to the trustees in bankruptcy, and their appeal by way of assignment of cross-error comes too late. *Witt* v. *Witt's Ex'r,* 146 Va. 256, 262, 135 S. E. 681.

Furthermore, it is perfectly clear that the subsequent conduct of the bank and the trustees in bankruptcy shows that they considered the decree final. As has been pointed out, the decree of December 14, 1933, provided for a complete distribution of the fund, a portion of which was paid to the bondholders represented by the bank and the trustees in bankruptcy. Not only was no provision made in this decree for a suspension of these payments pending an appeal, but it was admitted during the oral argument before us that all of the funds had been distributed under this decree with the exception of the dividend of $5,933.20 claimed by the First National Company, by whom this appeal was taken. We think, therefore, that both the bank and the trustees in bankruptcy are estopped by having participated in the distribution of the fund under the decree, even assuming that it would be possible to restore to the registry of the court a fund which has admittedly been distributed among numerous creditors and claimants.

It will, therefore, not be necessary for us to decide whether the lower court was right in decreeing on April 1, 1932, that the excess fund of $38,256.67 did not belong to either the trustees in bankruptcy of Edwards-Slaughter Company, or to the bank for the benefit of the bondholders alone.

This brings us to the final point in the case—whether

the First National Company was entitled to share on the same basis as the bondholders in the distribution of the excess insurance fund of $38,256.67. If the Guaranty Company is allowed to prove its claim on this basis in the present suit, it would receive a dividend of $5,933.20, which its Maryland receivers contend should be paid to them for distribution to the guarantor's general creditors, among whom are the bondholders who hold the unsatisfied guaranty of the First National Company.

The bank (representing the bondholders) earnestly insists that it will be highly inequitable in the distribution of this excess insurance fund (an asset of the insolvent debtor, Edwards-Slaughter Company) for the insolvent First National Company to compete with the bondholders, the unsatisfied holders of the latter's guaranty. The bank argues that the court has in its possession the fund, and before it all of the contending parties, and should not let the guarantor go off with a portion of the fund leaving any part of its contract of guaranty unsatisfied. It contends that not only should the rights of the guarantor to receive a dividend from this fund be *postponed* until the bondholders have been paid in full, but further, that the bondholders should be subrogated to the rights of the First National Company to the end that the whole amount of the latter's dividend of $5,933.20 from the insurance fund be turned over to them, the bondholders. This position was sustained by the lower court.

Undoubtedly the right of the First National Company should be postponed to that of the bondholders in the distribution of the fund. Surely it is improper that in the distribution of the property of an insolvent (Edwards-Slaughter Company), the guarantor of its debt (the First National Company) should compete with the unsatisfied holders of its guaranty (the bondholders). To allow this to be done would be to permit, approve and reward the violation of the contract of guaranty, for it is conceded that the fund is insufficient to satisfy the bondholders. To allow the guarantor to prove its claim against the debtor's assets,

and share *pari passu* with the bondholders, would reduce the amount of the bondholders' dividend. Thus the guarantor's own act would reduce the debtor's ability to pay by the precise amount of the dividend which the guarantor received. Surely a court of equity should not sanction this.

In this connection the case of *Jenkins* v. *National Surety Co.*, 277 U. S. 258, 48 S. Ct. 445, 72 L. Ed. 874, is helpful. In that case a county treasurer had a deposit of some $600,-000 in a bank, the collectibility of $75,000 of which the surety company had guaranteed. At the same time the surety took from the bank an agreement indemnifying it against loss on account of the guaranty. The bank having become insolvent, the surety complied with its guaranty and paid the treasurer the sum of $75,000, leaving still a large amount of the deposit unpaid. Thus the surety was a general creditor of the bank for the amount paid on its guaranty, and the treasurer was likewise a general creditor for the unpaid balance due him on his deposit. The surety company claimed that both it and the treasurer should prove their claims against the bank and share ratably in the distribution of the bank's assets. In holding that the surety's claim should be postponed to that of the depositor, Mr. Justice Stone said, 277 U. S. 258, page 266, 48 S. Ct. 445, 446, 72 L. Ed. 874, that "any dividends paid the surety on its claim for indemnity before the creditor's whole claim has been satisfied would decrease the creditor's dividends by his proportionate share of the payments to the surety." And, further—

"Respondent, in insisting on the letter of its agreement, takes a position in effect inconsistent with its obligation to secure to the treasurer the repayment of his deposits to the extent of $125,000. If after paying that amount to the treasurer it may then compete with him in the distribution of the insolvent's assets, the treasurer's recovery on the balance of his claim is reduced accordingly and the benefit of the surety bond to the treasurer is diminished *pro tanto*. By the expedient of taking a separate indemnity agreement

from the debtor the surety would be enabled to deprive the creditor of the full benefit of the security he had demanded.

"The established rule that the surety may not claim subrogation against an insolvent debtor until the creditor is paid in full is a recognition of the inconsistency of that position. *United States* v. *National Surety Co.,* 254 U. S. 73, 76, 41 S. Ct. 29, 65 L. Ed. 143; *Peoples* v. *Peoples Bros.* (D. C.) 254 Fed. 489; *United States Fidelity & Guaranty Co.* v. *Union Bank & Trust Co.* (C. C. A.) 228 Fed. 448, 455. The rule would go for naught if, by claiming indemnity instead of subrogation, the surety could achieve the same result. The same policy against permitting a surety to compete with the creditor for the insolvent debtor's assets requires that the surety be denied subrogation to security given to a creditor for several debts for only one of which the surety is obligated. *National Bank of Commerce* v. *Rockefeller* (C. C. A.) 174 Fed. 22. Similar reasoning underlies the requirement of equity that the surety who holds the security of an insolvent debtor must give the benefit of it to the creditor for whom he is surety, until the debt is fully paid. See *Keller* v. *Ashford,* 133 U. S. 610, 10 S. Ct. 494, 33 L. Ed. 667; *Hampton* v. *Phipps,* 108 U. S. 260, 2 S. Ct. 622, 27 L. Ed. 719; *Chamberlain* v. *St. Paul & S. C. R. Co.,* 92 U. S. 299, 306, 23 L. Ed. 715; 2 Pomeroy, Equitable Remedies (2d Ed.) section 925.

"Wherever equitable principles are called in play, as they preeminently are in determining the rights and liabilities of sureties and in the distribution of insolvents' estates, they likewise forbid the surety to secure by independent contract with the debtor indemnity at the expense of the creditor whose claim he has undertaken to secure."

Therefore, if a surety who has fulfilled his obligations to the creditor under the contract of suretyship will not be permitted to compete with the creditor in the distribution of the debtor's assets, then surely the principle should apply where the surety has become insolvent and can never perform his obligation to the creditor.

Since it is conceded that the excess insurance fund is in-

sufficient to pay the bondholders and other general creditors in full, what will be the result if the rights of the guarantor (First National Company) are *merely postponed* to those of the bondholders? Obviously such a procedure would redound to the benefit of not only the bondholders but also the other general creditors of Edwards-Slaughter Company, who have no claims of any kind against the guarantor or in the latter's dividend. A mere postponement of the guarantor's claim, which is here tantamount to an elimination thereof, would be unjust both to the bondholders and to the guarantor, for it would result in a portion of the guarantor's dividend being taken away from the bondholders and given to the other general creditors of Edwards-Slaughter Company, who are asserting no claim thereto.

The court is not here winding up the estate of an insolvent. Its sole function is to administer the excess insurance money which the bank, upon the institution of this suit, surrendered to it for an equitable distribution. The proceeding is of an *in rem* character. We think that in equity the guarantor's interest in these funds should be impressed with a trust to the end that it be applied towards the performance of the contract of guaranty.

This is, in effect, an application of the well recognized doctrine that where a surety has obtained security from the principal debtor for his, the surety's, protection, the creditor is entitled to the security. 25 Ruling Case Law, page 1335, section 18; *Fourth National Bank's Appeal*, 123 Pa. 473, 16 A. 779, 10 Am. St. Rep. 538; *Jennings* v. *Taylor*, 102 Va. 191, 195, 45 S. E. 913; *Francisco* v. *Shelton*, 85 Va. 779, 786, 8 S. E. 789; *Washington, etc., R. Co.* v. *Cazenove*, 83 Va. 744, 748, 3 S. E. 433; *Jenkins* v. *National Surety Co., supra*.

The lower court was right in holding that the bank, representing the bondholders, was entitled to the guarantor's dividend of $5,933.20, and the decree should be affirmed.

*Affirmed.*