# CUNNINGHAM *v.* MACON & BRUNSWICK RAIL-ROAD COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF GEORGIA.

No. 91. Argued November 22, 23, 1894. — Decided March 4, 1895.

In 1866 the legislature of Georgia enacted a law loaning the credit of the State to a railroad company by endorsing its bonds to the amount of $10,000 per mile, and further providing that the endorsement should operate as a mortgage on all the property of the company. These bonds were issued to the amount of $1,950,000, endorsed and sold. In 1868 the new constitution of the State then adopted provided that the State should not loan its credit to any company without a provision that the whole property of the company should be bound to the State as security prior to any other indebtedness. In 1870 the legislature passed an act "to amend" the act of 1866, authorizing the governor to endorse the company's bonds to a further extent of $3000 per mile "in addition to $10,000 as recited in the act of which this is amendatory." The new bonds were issued, varying in form from the former bonds, were endorsed by the State, and were sold. In 1873 the company defaulted in the payment of the bonds of 1866, and the governor took possession of the property. The legislature then by joint resolution declared the bonds of 1866 to be valid, and those of 1870 to be unconstitutional. In 1875 the governor ordered the property sold under the provisions of the act of 1866, and the sale took place that year, the State being the purchaser at

$1,000,000 and taking the conveyance. The bonds issued under the act of 1866 were then taken up and retired. The holders of the bonds issued in 1870 filed a bill in equity to set aside the sale, but the bill was dismissed upon the ground that the State was a necessary party, and could not be brought in without its consent. Meanwhile, the State having sold the whole property, a supplemental bill was filed in that case by leave of court against the purchasers, attempting to charge the property in their hands with a trust in favor of the holders of the bonds of 1870, charging that the State had been their trustee to enforce their equitable rights, and had been guilty of a breach of its trust by selling the property at a price much below its real value. *Held,*

(1) That the plaintiffs were not entitled to be subrogated to the mortgage security taken by the State, and as such to maintain this suit, because the property had passed out of the possession of the State when this suit was brought, and because the State was a necessary party to the enforcement of such a claim;

(2) That the only bonds secured by the statutory mortgage were those issued in 1866, and that those issued in 1870 were not secured by it;

(3) That even if they had been secured by it these complainants were junior creditors to those holding the bonds of 1866, with rights subordinate to theirs, and it was their duty to attend the sale and protect themselves by raising the bid to an amount sufficient for that purpose;

(4) That they could not avoid the sale without tendering reimbursement to the first mortgage creditors, which they had not done.

THE Macon and Brunswick Railroad Company was chartered by the legislature of Georgia in 1856. Acts of 1856, No. 119, p. 181. By the act of December 3, 1866, the legislature of the State authorized the governor to endorse the bonds of the road to the extent of $10,000 per mile. The act reads as follows :

" *An act to extend the aid of the State to the completion of the Macon and Brunswick railroad, and for other purposes.*

" *Whereas* the Macon and Brunswick railroad has been completed to the distance of fifty miles from the city of Macon, and is thoroughly equipped, and daily trains are running thereon, and seventy miles additional are graded and ready for the superstructure ; *and whereas* its completion to Brunswick would greatly inure to the benefit of the State in developing its agricultural, commercial, and manufacturing interests ; *and whereas*, by reason of the financial embarrass-

ments resulting from the late war, the stockholders of said railroad are unable to supply the capital necessary to the completion of this great work:

"SECTION 1. *Be it enacted, etc.*, That his Excellency, the Governor, be and he is hereby authorized to place the endorsement of the State on the bonds of the Macon and Brunswick Railroad Company which said company may issue, to the amount of ten thousand dollars per mile for as many miles of said road as are now completed, and the like amount per mile for every additional ten miles, as the same may be completed and placed in running order, on the following terms and conditions, to wit: Before any such endorsement shall be made the governor shall be satisfied that as much of the road as the said endorsement shall be applied for is really finished and in complete running order, and that said road is free from all liens, or mortgages, or other encumbrances, which may in any manner endanger the security of the State: and upon the further condition and express understanding that any endorsement of said bonds, when thus made, shall not only vest the title to all property of every kind which may be purchased with said bonds in the State, until all the bonds so endorsed shall be paid; but the said endorsement shall be, and is hereby understood to operate as a prior lien or mortgage on all of the property of the company, to be enforced as hereinafter provided for.

"SEC. 2. In the event of any bond or bonds endorsed by the State, as provided in the first section of this act, or the interest due thereon, shall not be paid by said railroad company at maturity, or when due, it shall be the duty of the governor, upon information of such default by any holder of said bond or bonds, to seize and take possession of all the property of said railroad company, and apply the earnings of said road to the extinguishment of said bond, or bonds, or coupons, and he shall sell the said road and its equipments, and other property belonging to said company in such manner and at such time as in his judgment may best subserve the interest of all concerned." Acts of 1866, No. 178, p. 127.

Under this authority the governor endorsed the bonds of

the company to the extent of $1,950,000. The bonds were thus entitled:

" State of Georgia.

" UNITED STATES OF AMERICA.

"Macon & Brunswick Railroad Company. First and Only Mortgage Bond."

. They acknowledged that the Macon and Brunswick Railroad Company was indebted to Charles J. Jenkins, as governor of Georgia, and to his successors in office, or to the bearer thereof, and also recited the statutory mortgage, which was reserved by the State in the act of 1866. In June, 1870, the president of the railroad company executed an instrument in which he stated that these bonds had been issued in conformity with the statute, and that the company was desirous of confirming the lien held by the State to secure their payment, and that, therefore, he, as president, recognized, on behalf of the company, the validity of the statutory mortgage and of the lien created thereby. To this instrument the State was not a party. In October, 1870, the legislature of Georgia· passed the following act:

" *An act to amend an act to extend the aid of the State to the completion of the Macon and Brunswick railroad, and for other purposes.*

"Whereas the Macon and Brunswick railroad has been completed to Brunswick, requiring a greater outlay of money than was originally contemplated, to place the same in complete running order, and to furnish the necessary cars, engines, and machinery; and whereas the State has, by recent legislation, endorsed the bonds of other railroads to the extent of fifteen thousand dollars per mile:

" SECTION 1. *The general assembly of the State of Georgia do enact,* That the above-recited act be so amended as to authorize the governor to place the endorsements of the State, to the extent of three thousand dollars per mile, upon the bonds of said Macon and Brunswick Railroad Company, in addition to ten thousand dollars, as recited in the act of which this is amendatory.

" SEC. 2. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and the same are, hereby repealed."

Under this act bonds to the extent of $600,000 were issued by the railroad and endorsed by the State. These bonds differed in several particulars from those of the first issue. Thus, instead of acknowledging that the corporation was indebted to the governor of the State, they declared that it was indebted to Morris K. Jesup, of the city of New York, or bearer; they made no reference to the mortgage or lien held by the State under the act of 1866, nor did they purport to be secured by mortgage. Each of them contained this recital : " This is one of a series to the extent of $3000 per mile of the Macon and Brunswick Railroad Company, endorsed by the State of Georgia in accordance with an act of legislature passed October 27, 1870." At the time this act was passed the constitution of Georgia contained the following provision :

" The general assembly shall pass no law making the State a stockholder in any corporate company ; nor shall the credit of the State be granted or loaned to aid any company without a provision that the whole property of the company shall be bound for the security of the State prior to any other debt or lien, except to laborers ; nor to any company in which there is not already an equal amount invested by private persons ; nor for any other object than a work of public improvement." Constitution of 1868, Art. 3, § 5.

In August, 1872, the legislature of Georgia passed a resolution declaring that the State's guaranty placed on the bonds of the Macon and Brunswick Railroad Company was binding. In 1873 the company defaulted in the payment of interest on the bonds issued under the act of 1866, and which bore the State's endorsement. In July of that year the governor issued a proclamation reciting the passage of the act of 1866, the issue of the bonds thereunder, and the company's default. He announced also that, in pursuance of the power conferred upon him by that act, he had seized the company's property and had appointed an agent of the State to take possession and control of the same. In March, 1875, the legis-

lature passed a resolution declaring that the $1,950,000 issue of bonds which had been endorsed under the act of 1866 were valid and binding obligations of the State, but that the $600,000 issue under the act of 1870 was unconstitutional, null, and void; that it was the sense of the general assembly that the railroad, with its franchises, equipments, and appurtenances, should be sold by the governor at an early date, and, if considered practicable, as early as June 1, 1875, at public or private sale, and upon such terms and for such a price in money or first mortgage endorsed bonds of the Macon and Brunswick Railroad Company, or bonds of the State, as in his judgment might be consistent with the interests of the State, and that no commission or percentage should be authorized or allowed under such sale.

In April, 1875, the governor issued his executive order for the sale of the railroad property which had been under seizure since 1873. This order, after also reciting the act of 1866, and the endorsement by the State of the bonds issued thereunder, proceeded as follows:

"Whereas, among other provisions of said second section of said act, it is expressly provided that after the seizure of all the property of said company, as aforesaid, the governor 'shall sell the road and its equipments and other property belonging to said company, in such manner and at such times as, in his judgment, may best subserve the interest of all concerned;' and having become satisfied that it will be for the best interest of the State and all concerned that all the property of the company seized under said order be sold at an early day: it is therefore

"Ordered, that all the property seized, as aforesaid, now in the possession of Edward A. Flewellen, receiver of the property of the Macon and Brunswick Railroad Company, under said order, be sold to the highest bidder at public outcry at the depot of the Macon and Brunswick Railroad Company, in the city of Macon, between the hours of 10 o'clock A.M. and 4 o'clock P.M. on the first Tuesday in June next.

"The said sale will be made for cash, for bonds of this State, or the first mortgage bonds of the company, endorsed

in behalf of the State, under the authority of the act approved December 3, 1866. It is further

"Ordered, that the said Edward A. Flewellen, as receiver aforesaid, make out an advertisement under this order, setting forth with requisite particularity all the property to be sold as aforesaid, and publish the same in such public gazettes in this State and in the city of New York as, in his judgment, will give proper publication to said sale."

The sale thus directed took place on the date fixed, and the property was bought in by the governor, on behalf of the State, for $1,000,000, the purchase having been authorized by the legislature of the State. The governor executed a formal conveyance of the purchase to the State on June 3, 1875, and the State subsequently retired the $1,950,000 of bonds, which had been issued and endorsed under the act of 1866. In September, 1877, the complainants-appellants, alleging themselves to be holders and owners of bonds of the Macon and Brunswick Railroad Company, endorsed by the State under the act of 1870, which, they averred, they had acquired in open market after the State had acknowledged her liability thereon, and before the passage of the act declaring the endorsement invalid, filed their bill in the Circuit Court of the United States for the Southern District of Georgia against the company and certain persons named therein, "styling themselves directors of the Macon and Brunswick Railroad," and J. W. Renfroe, treasurer, and Alfred H. Colquitt, governor of Georgia. This bill, after setting out the facts substantially as here given, charged that the sale made by the governor was void for the following reasons:

"1st. Because neither the legislature nor the governor had the right to exclude the $600,000 series of endorsed bonds from being used as so much cash in the purchase of said road at their face value. Certainly they were entitled to be so used in the event of the exhaustion of the $1,950,000, which themselves should have — received as cash at par.

"2d. Because the governor was not authorized to bid on said property for the State, and the State had no constitutional power to make the purchase, or if said sale is not void

it is certainly voidable, because under the statutory and executed mortgages the State is the trustee of the property mortgaged for the benefit of the bondholders, and had no right to buy at her own sale as such trustee without incurring the risk of having such sale set aside at the instance of any beneficiary under the trust, and your orator as such beneficiary elects to set said sale aside."

The bill also alleged the taking up by the State of the $1,950,000 of bonds issued under the act of 1866, subsequent to her purchase of the property, and averred, in the alternative, that if the sale was not void, because of the fact that the mortgage was solely to indemnify the State, then the holders of the bonds issued under the act of 1870 were entitled to a, ratable distribution of the proceeds with the holders of those endorsed under the act of 1866, and therefore should receive an equal *pro rata* share of all sums paid or to be paid by the State on the retired issue of $1,950,000 under the act of 1866. The bill was demurred to by Renfroe, treasurer, and Colquitt, governor, and after hearing was dismissed The complainants thereupon prosecuted their appeal to this court, where the decree below was affirmed. *Cunningham* v. *Macon & Brunswick Railroad,* 109 U. S. 446. Meanwhile, subsequent to the decree of dismissal below, the railroad and its appurtenances were sold by the State, under proper legislative authority, for $1,250,000, and through a series of transfers, some of them being the result of judicial foreclosure of mortgages, the road finally became the property of the East Tennessee, Virginia and Georgia Railroad Company. In 1886, after the filing of the mandate of this court, affirming the decree of dismissal, a motion was made below for a decree *pro confesso* against the Macon and Brunswick Railroad Company, and leave was given to file a supplemental bill making the East Tennessee, Virginia and Georgia Railroad Company a party defendant. The amended bill was duly filed. This bill, after substantially reiterating the averments of the original bill, and charging likewise that the sale at which the governor bought in the property on behalf of the State was null and void, alleged that the East Tennessee, Virginia and

Georgia Railroad Company was a purchaser with notice of the illegality, and then proceeded as follows:

" And your orator charges that the said State of Georgia held the said property after the seizure thereof as a trust for the payment of the obligations of the said the Macon and Brunswick Railroad Company to the extent of the avails of a sale of the said property to be made for the interest of all creditors of said company, with the privilege unto the said State of protection, first, out of said avails, of its own endorsement of the bonds of said company; that the said State, in and by the resolution aforesaid, declared its endorsement of the bonds held by your orator to be not binding on it, and in advance of demand upon it by your orator refused thereby to pay the said endorsement or to enforce its said privilege of protection of said endorsement from the avails of said property so in its hands; that your orator thereby became at least entitled to the advantage of the said mortgage lien of the said State for his protection; to have the said property sold with proper regard to his interests and the interests of his fellow-bondholders; to be allowed to participate freely with all other lienors of the said railroad at the sale of the said railroad property by his said trustee, in bidding upon said property and paying therefor in the bonds held by him, hereinbefore mentioned, with due regard to the protection of any and all prior liens and the costs and expenses of sale.

" And your orator shows that in and by the said resolutions under which said sale was made, and under color of which the said trustee for your orator became possessed of the said railroad property, the said State of Georgia gave notice of its intention to commit a breach of trust by excluding your orator from participation in said sale on equitable terms with the holders of the first mortgage bonds, by excluding your orator, by the provisions thereof, from participation in the avails of said sale or any benefit therefrom by announcing openly to the world its intention to sell the said road in its own interest rather than in the interest of the creditors of said company, and by divers other acts and announcements, all concurring to demonstrate positively to

the world that the said trustee had determined to exclude your orator from any benefit under the said trust, and that it would not regard or protect in any respect the interests of your orator and his fellow-bondholders in the said sale or distribution of avails.

"And your orator shows that in point of fact the said State of Georgia, at the said sale, did commit the said breach of trust according to its previously announced intention, did exclude your orator and his fellow-bondholders from their rights of equitable protection on sale by bidding and paying the bonds held by them, did sell the said road in a manner contrary to the interests of the creditors generally of the said road for a very small part of its real value, the price nominally bid therefor being one million dollars and the real value thereof being four million dollars, and did sell the road to itself for said price in its own interest and without regard to the interests of the beneficiaries of the trust, including your orator, and thereupon, in equity, held the said property as a trust for your orator and subject to his lien for the payment of his said bonds.

"And your orator avers that the said the East Tennessee, Virginia and Georgia Railroad Company and the East Tennessee, Virginia and Georgia Railway Company had full notice in the purchase of said property made by each of the said breach of trust by said trustee, and took the said property subject to the duties and liabilities of said trustee towards your orator — that is to say, with the lien of your orator unaffected and undischarged by the sale of said property made by said trustee in breach of his fiduciary duty, and that the said last-mentioned company now holds said property as trustee for your orator and subject to your orator's lien for the payment of the said indebtedness to him."

The East Tennessee Company answered the supplemental bill, stating the various conveyances through which the title had finally come to be vested in itself, and asserting the validity thereof. All the facts above stated appear on the face of the pleadings and exhibits. Before the sale was made by the State, John P. Branch, a holder of bonds of the same series

as those held by these complainants, had filed a bill in the Circuit Court of the Southern District of Georgia, asking for an injunction to prevent the sale, but the application was denied. *Branch* v. *Macon and Brunswick Railroad*, 2 Woods, 385. Branch had also taken a decree *pro confesso* against the Macon and Brunswick Railroad Company, and he was allowed to intervene below and become a party to the present suit, in which he claims the same rights as those asserted in the original and supplemental bill. The cause was submitted to the court on bill, answer, and exhibits, and resulted in a decree of dismissal. The case was then brought here by appeal.

*Mr. Charles N. West* for appellants. *Mr. W. W. Montgomery* and *Mr. Daniel H. Chamberlain*, each filed a brief for same.

*Mr. George Hoadly* for the East Tennessee, Virginia and Georgia Railway Company, appellee.

*Mr. John Howard* closed for appellants.

I. In respect to the construction of the act of December 4, 1866, there are two classes of cases to be considered:

(1) When the State assumes a liability for a corporation, and the corporation conveys its property in trust as an indemnity to the State against loss, and the bondholders of the corporation take nothing. *Chamberlain* v. *St. Paul & Sioux City Railroad*, 92 U. S. 299.

(2) When the State assumes a liability for a corporation, and the corporation conveys its property in trust as an indemnity to the State, and *also* in trust to secure its bondholders as its principal debtors. *Hand* v. *Savannah & Charleston Railroad*, 12 S. C. 314, cited and approved in *Tennessee Bond Cases*, 114 U. S. 688, and also *Railroads* v. *Schutte*, 103 U. S. 118.

In this last case, it was held that the endorsement by the State of Florida of the bonds of the railroad company was void, because unconstitutional; but it was also held that

such fact did not impair the validity of the statutory mortgage and trust in favor of the bondholders of the company. And that case was cited and approved in *Supervisors* v. *Stanley*, 105 U. S. 312.

Should it be held that the endorsement by the State of Georgia of the bonds of the Macon and Brunswick Railroad Company was unconstitutional and void, *Railroads* v. *Schutte* would directly apply in favor of the express statutory trust for the bondholders of this company, whose bonds were thus endorsed.

II. And now as to the legal effect and operation of the act of Georgia of October 27, 1870, as an amendment to the original act of December 3, 1866.

There appears to be nothing in the constitution of Georgia regulating the manner in which amendments to previous acts shall be made, as is provided in many of the States, and therefore the legal effect of this amendment must be governed by the general law and the unlimited power of the legislature of Georgia to amend its acts of assembly in any manner it may deem proper and efficient for the purpose. The act of 1866 had been in full operation, and its purpose, intendment and effect are presumed to have been fully understood as securing an indemnity to the State for its endorsement of the bonds of the railroad company, and as an express trust for the payment of those bonds, together with ample power and machinery provided for those purposes. In 1870, the construction of the whole road, from Macon to Brunswick, had been completed, but the road was a dead thing, unless it could be furnished with equipments for its operation. The amendatory act was passed to accomplish that object, as its title and its preamble show; and then the act proceeded to amend the original act by authorizing the issue of additional bonds, with the endorsement of the State thereon, and repealed all acts in conflict with that legislation. The two acts must be taken as one act, and as having all of the effect of the terms and provisions of the original act in respect to the protection of the State and the bondholders, as if they were literally incorporated in the amendatory act *in totidem verbis*. *Holbrook* v.

*Nichol*, 36 Illinois, 161, 167. And if the act were susceptible of two constructions, one of which would so emasculate it as to make it meaningless and useless, and the other would be reasonable, and would vitalize and give it full legal effect and operation, and especially if in harmony with, and in effectuation of, previous legislation and its object and policy, the last should be adopted. Sutherland on Statutory Construction, § 323.

The provision of the state constitution *in re nata* was of course impresssd upon the act, and the question then arises, whose duty was it to see that there was a fulfilment of the constitutional requirements before the endorsement of the State could be validly made upon the new bonds to be issued? And here, again, there are two classes of cases:

(*a*) One requiring the purchaser to ascertain and determine for himself, from public records, to which he is referred, some extrinsic fact or facts necessary to authorize the act to be done which is to create the liability. *Sutliff* v. *Lake County Commissioners*, 147 U. S. 230, 237, in which the two classes of cases are collated and distinguished in the opinion of the court delivered by Mr. Justice Gray.

(*b*) The other requires such facts to be ascertained and determined by some officer or officers whose certificate as to the fulfilment of the necessary requirements is in the nature of an adjudication, and is conclusive upon the subject. *Chaffee County* v. *Potter*, 142 U. S. 355. Of this class is this case.

(1) By the first section of the original act, the governor of the State was constituted the tribunal that was to be "*satisfied*" that the precedent conditions as to the State's endorsement had been complied with and fulfilled, and his endorsement of the bonds was at once a decision upon the subject, and an assurance and announcement to the public of the fact of such compliance and fulfilment, and whether right or wrong was binding upon all parties. And hence the State of Georgia has never made any question as to the validity of the endorsement of those bonds, but on the contrary has ever recognized it.

The governor was charged with the same duty and judicial function in respect to the bonds authorized to be issued and endorsed by the amendment of 1870, with the addition only of ascertaining and determining or being "satisfied" as to whether or not the constitutional requirements had been fulfilled and complied with, and his endorsement upon those bonds was equally an express decision, certificate, and announcement to the public as to the fulfilment of those requirements, and was equally the *imprimatur* of the State to that effect.

(2) But the legislature subsequently undertook to establish a tribunal with ample powers in the nature of an appellate jurisdiction for the investigation and review of the action of the governor in the premises, by providing for the constitution of a commission composed of three persons, one to be selected by the President of the Senate, and the other two by the Speaker of the House of Representatives, clothed with full authority and power, and with the ample time of sixty days, to inquire into the whole matter, and for that purpose with "full power and authority to examine witnesses under oath, to send for persons, books, and papers, and to exercise such other powers as might be necessary to carry into effect the provisions of the act." That judicial commission performed its duty and reported in favor of the validity of the action of the governor, and the legislature adopted that report, and by a joint resolution enacted "that the State's guarantee on the bonds of the Macon and Brunswick Railroad Company is binding on the State."

III. *Contract and estoppel, and violation of contractual obligation.* It was under these circumstances that the appellants purchased the bonds now in suit, for valuable consideration, in open market, not only without any notice of invalidity as to the State's endorsement or touching the express trust of which the State was trustee for the payment of the bonds, but, on the contrary, with the above solemn certificates and assurances of the State as to the regularity and binding effect of the whole proceedings in the premises. There was thus formed between the State and the company on the one hand

and the purchasers on the other, a valid contract, the obligation of which was inviolable by anything that either the State or the company could do, and which the State was estopped from attempting to undo. It was a contract on the part of the State, not only that it would be bound by its endorsement of the bonds, but that it would faithfully execute the express trust it had assumed for the payment of the bonds, interest and principal. Its subsequent repudiation of its contract did not affect its validity and binding obligation any more than did its repudiation of its contract in *Fletcher* v. *Peck*, 6 Cranch, 87, which was the prototype of this case.

IV. *Sale of the trust property a fraudulent breach of trust upon its face, and full notice of the fact to the successive alienees.* The sale of the trust property in disregard of the rights of these bondholders was a plain breach of trust, and its purchase by the State at its own sale as trustee was not only another plain breach of trust, but was fraudulent *per se*, and its conveyance to itself bore the fraud upon its face and that fraud followed the title wherever it went.

No proof of actual fraud need be adduced by the beneficiaries of the trust when following the trust property; for the purchase by the trustee was *inherently* a breach of trust, and the law conclusively presumes it to have been fraudulent, and if, in a court of equity, such a transaction can ever be permitted to stand, except with the consent of the beneficiaries of the trust, the burden of proof is upon the trustee and his alienees to show that the property sold for its fair value, and that *uberrima fides* was exercised in the sale, and to " vindicate the transaction from all suspicion." 1 Perry on Trusts, §§ 197, 195, 277; 2 Perry on Trusts, §§ 602 *o*, 602 *p*, 602 *w*; *Wormley* v. *Wormley*, 8 Wheat. 421; *Michoud* v. *Girod*, 4 How. 503.

In the absence of such affirmative proof, a fraudulent breach of trust is indelibly stamped upon the face of the transaction, and is notice to all the world tracing title through that transaction of its inherent vice, and of the unaffected rights of the beneficiaries in the property. For, though the purchase was thus a fraudulent breach of trust, *ex rei necessitate*, and apparent upon its face, the conveyance

of the trustee passed the legal title, which, indeed, was absolute at law, but subject in equity to its original trust, and the holder is himself a trustee for the beneficiaries. .1 Perry on Trusts, §§ 274, 374, 355; 2 Perry, § 602 *k*; *Taylor* v. *King,* 6 Munford, 358, 366; *S. C.* 8 Am. Dec. 746; *Pownal* v. *Taylor,* 10 Leigh, 172, 183; 34 Am. Dec. 725; *Underwood* v. *McVeigh,* 23 Grat. 409.

Such is the case here. The conveyance from the State of Georgia, the trustee, to itself of June 3, 1873, expressly recites the fraudulent breach of trust as the origin of its title. The conveyance of the 28th of February, 1880, from the State of Georgia to the Macon and Brunswick Railroad Company expressly recites the same thing, and reserves a lien on the property for the payment of the purchase money.

The next conveyance refers to that lien, and hence to the conveyance in which it was reserved. The next conveyance also refers to that lien and its reservation. So as to the next conveyance, and so as to the next and *last* conveyance — that by which the legal title, clothed with its original trust, passed to the defendant, the East Tennessee, Virginia & Georgia Railroad Company, which consequently holds it as trustee for the beneficiaries of that trust, the appellants and their associates.

It thus appears that, in addition to the notice given to the world by the officially published acts of the legislature and the proclamations and advertisements of the governor of Georgia, touching the manner in which and the purpose for which the sale of this trust property was to be conducted in breach of trust, and in addition to the notice given by the *lis pendens,* here is, in the chain of title leading up to the fraudulent breach of trust by the trustee in itself purchasing the trust property, actual and positive notice to all intermediate holders, and to the present holder, of that fraudulent breach of trust, as the origin and source of the only title conveyed to and now held by the defendant company. *Caveat emptor* applied from the first to the last sale and conveyance made.

V. *The appellants not in default.* The appellants did all they reasonably could and in good time, first, to prevent by injunction the contemplated violation of their rights, and

their bill for that purpose was filed on the 29th of September, 1867, while the trust property was still in the hands of their original trustee, the State of Georgia ; and, besides the officers of the State, the bill made the Macon & Brunswick Railroad, their principal debtor and the equitable owner of the property, a party. It was, at least, doubtful whether or not the State of Georgia was a party to the suit, as is shown by the elaborate opinion of this court itself, dismissing the bill for the reason that she was a party, and the dissenting opinion of two of the learned justices to the contrary.

The suit was a pending suit against the officers of the State, as well as against the other defendants, until the bill was finally dismissed by the mandate of this court, which came down and was filed on the 21st of October, 1885, and was made the decree of the court below on the 16th of December, 1885. Meanwhile, all of the *mesne* conveyances of this trust property had taken place, and the present defendant company was then the holder and in possession. All of those transactions, made under such circumstances, were obviously made, upon the established doctrine of *lis pendens*, with legal notice of the pendency of the litigation and subject to its ultimate results, and to amended and supplemental proceedings, germane to the original bill and becoming a part of the original case by being prosecuted for the effectuation of its leading object — the subjection of the trust property to the trust rights of the complainants. After dismissal of their bill, as to the officers of the State, upon a difficult and doubtful point of law, the complainants were certainly entitled to a reasonable time within which to look about them, ascertain the complicated facts of intermediate occurrence since the original sale, obtain legal advice, and prepare their pleadings when a course of proceeding should be decided upon. Their supplemental bill, bringing in the present defendant company as a party and claiming to hold it as a trustee for their benefit, was filed by leave of court on December 30, 1886.

This was done under what was said by this court in its decision in this case, 109 U. S. 446 ; and as it is not pretended that the defendant company was induced to make its purchase

of the trust property by anything that the complainants had done, or had left undone, and as in addition to all other modes of notice of the infirmity of their title, they had, in its direct chain, actual and positive notice of its infirmity by reason of its origin in a breach of trust, fraudulent, *per se*, it is not perceived upon what ground of *laches*, or prescription, the just rights of the complainants, which were originally attached to the property, and have followed it to a present responsible holder, amenable to the jurisdiction of the court, can be defeated.

VI. *As to parties and the jurisdiction of this court.* Georgia is neither an indispensable, nor a necessary, nor a proper party.

(*a*) The present controversy is by and between the complainants and the defendant company, its trustee, in possession. The complainants have now no controversy with the State of Georgia, and neither need nor ask anything at its hands. All they need and ask is that their trust property, now in the hands and possession of a competent trustee, shall be applied and the trust executed for their benefit.

(*b*) If Georgia has any rights, or interests, which it wishes to assert or considers as worthy of assertion, or protection, she can become a party to this suit, if not inhibited from doing so by her constitutional prohibition of 1879, made just before the fraudulent sale of this trust property in 1880 to the new company got up for the purpose of the sale.

(*c*) But if she has chosen to encircle herself with an environment of impenetrable immunity from the judicial investigation of her questionable or fraudulent acts, first by causing the adoption of the Eleventh Amendment to the Constitution of the United States, (*Chisholm* v. *The State of Georgia*,) and then by her own constitutional amendment, why, of course, that is her own affair. But, notwithstanding, it would seem that the constitutional and legal rights of the citizens of other States of the Union still remain unimpaired, and are to be determined as they shall judicially appear in the courts of the United States, in the absence of any ostrich State, that should stick its head in the sand, or turtle-like enclose itself in its exclusive shell.

CLVI—27

However, Georgia has now no interest in this controversy, except the alleged lien for the purchase money of the fraudulent sale, which is subordinate to the rights and lien of the complainants. *Railroad Co.* v. *Soutter*, 13 Wall. 517. She has repudiated her endorsement of the bonds in suit, and all of the prior bonds, upon which she acknowledged her liability as endorser, have been paid, as admitted by opposite counsel. And while it is true that the right of the complainants, as principal creditors to be substituted to all of the securities of Georgia would have been destroyed by a lawful transfer of the trust property, yet in the case of an unlawful and fraudulent transfer, the same rule could not in reason and justice hold.

(*d*) But the complainants do not stand alone upon that ground. On the contrary, they stand upon the higher and original ground of an *express* trust created by the statutory mortgage, of which Georgia was constituted the trustee, with the legal title, and a power of seizure and sale, to be executed for the payment of the principal and interest of the bonds in suit.

VII. *The court has full jurisdiction.* It has before it all of the necessary, or even proper parties, for the execution of the original and still continuing trust, to wit: (1) The legal title; (2) the legal title coupled and impregnated with its original trust; (3) the trust property, in the possession and charge, and subject to the jurisdiction of the court for the administration of the trust.

MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

The case of the appellants rests upon two distinct legal propositions. The first one asserts their right to be subrogated to a mortgage security taken by the State of Georgia, and, by virtue of such subrogation, to enforce the mortgage against the property of the railway company. The other proposition is that they are direct mortgage creditors and have a specific mortgage lien upon the property of the company.

A right of subrogation, such as is here claimed by the appellants, does not involve any direct lien in favor of the creditor, resulting from his position as such. It only exists in consequence of his being, as a creditor, entitled to enjoy certain rights which are vested in the surety at the time the subrogation is claimed. This principle is fundamental, and its application is fatal to the complainants. As the creditors' right to subrogation depends on the existence, in the surety, of the rights to which subrogation is sought, it follows that after the surety has parted with the thing given him for his protection, the creditor can have no subrogation to such thing. In the present case, when the subrogation was claimed, the State had divested herself of all her rights, under the mortgage of indemnity, by selling the mortgaged premises, and had applied the proceeds of the sale to the payment of the debt which the mortgage was given to secure. She had no longer any rights of her own, therefore no subrogation could be derived through her. Aside from this consideration, in order to enforce equitable subrogation against a surety, he must be made a party to the cause. The State of Georgia is not, and cannot be, without her consent, impleaded. All the foregoing doctrine was applied and carefully stated in *Chamberlain* v. *St. Paul & Sioux City Railroad*, 92 U. S. 299, 306, where, speaking through Mr. Justice Field, the court said: " Whatever right the plaintiff had to compel the application of the lands received by the State to the payment of the bonds held by him, it was one resting in equity only. It was not a legal right arising out of any positive law or any agreement of the parties. It did not create any lien which attached to and followed the property. It was a right to be enforced, if at all, only by a court of chancery against the surety. But the State being the surety here, it could not be enforced at all, and not being a specific lien upon the property, cannot be enforced against the State's grantees. Where property passes to the State, subject to a specific lien or trust created by law or contract, such lien or trust may be enforced by the courts whenever the property comes under their jurisdiction and control. Thus, if property held by the government, covered by a mortgage of the origi-

nal owner, should be transferred to an individual, the jurisdiction of the court to enforce the mortgage would attach, as it existed previous to the acquisition of the government. *The Siren*, 7 Wall. 158, 159. But where the property is not affected by any specific lien or trust in the hands of the State, her transfer will pass an unencumbered estate."

The appellants must therefore rely for the maintenance of any rights they may possess upon their second proposition, which is to the effect that the bonds which they hold were secured by the statutory mortgage created by the act of 1866, and that the mortgage rights thus existing were not affected by the sale made by the State in 1875, but are yet subsisting, and may be enforced against the mortgaged property in the hands of the present defendant. It is obvious that if the statutory mortgage created by the act of 1866 was solely for the indemnification of the State and not for the security of the bondholders, the latter, whatever may be their indirect rights by subrogation, cannot directly avail themselves of the statutory mortgage. *Chamberlain* v. *St. Paul & Sioux City Railroad*, 92 U. S. 299; *Tennessee Bond Cases*, 114 U. S. 663. In order, therefore, to give them the relief which they seek, the statutory mortgage must be treated as having been given to secure the holders of the bonds. But if this view be taken, the claim here asserted is untenable. If there be a mortgage in favor of complainant's bonds, it must result from the terms of the act of 1866; but these bonds were not issued under that act, and owe their existence to the authority conferred by the act of 1870. This act reserved no mortgage, and the bonds of relator, having been issued under it, do not purport to be secured by mortgage. The claim that they are so secured is deduced from this contention: The act of 1870, it is asserted, purported to be an amendment to the act of 1866; therefore, the provisions as to mortgage found in the act of 1866 were incorporated into and became a part of the act of 1870. Between 1866 and 1870, however, the following amendment to the constitution of Georgia was adopted, and it was in force when the act of 1870 was passed:

" The general assembly shall pass no law making the State

a stockholder in any corporate company; nor shall the credit of the State be granted or loaned to aid any company without a provision that the whole property of the company shall be bound for the security of the State, prior to any other debt or lien, except to laborers; nor any company in which there is not already an equal amount invested by private persons, nor for any other object than a work of public improvement."

Under these provisions, if we were to construe the act of 1870 as desired, the result would be to make that act clearly violate the amendment to the constitution just cited; for, if the statutory mortgage secured the bondholders, then the bonds, issued under the act of 1866, were necessarily secured by a first mortgage, and those issued under the act of 1870 by a second. This conclusion can be avoided only in one or the other of two ways. First, by contending that the incorporation of the provisions of the act of 1866 into the act of 1870 made the bonds, issued under the latter act, equal in rank of mortgage with the bonds issued under the former; but to admit this contention would make the act of 1870 void, because it would, if thus construed, impair the obligations of the contract made with the holders of the bonds first issued. Or, second, by contending that, inasmuch as the mortgage created by the act of 1866 was in favor of the State and not in favor of the bondholders, the issuance of the bonds of the second series simply increased the aggregate amount of the State's liability, and that there was no difference between the two in rank of lien and mortgage, since the State held both the first and the second series, and the two were practically issued under one act. But this would be an assertion that the statutory mortgage created by the act of 1866 was solely for the benefit and indemnification of the State, and that the holders of the bonds were not directly interested therein. If this position be assumed, it defeats the complainants, as we have already seen.

However, it is claimed that even if the State's endorsement of the bonds, issued under the act of 1870, was in violation of the constitutional amendment, the only result is to render the endorsement void, and thus the bonds are left outstanding as

valid contracts of the railroad company, secured by the stat-
utory mortgage reserved in the act of 1866.    This contradicts
the plain text of that act, since it only purported to reserve
a mortgage in favor of bonds endorsed by the State.    And,
besides, if this argument were adopted, it would render effica-
cious a legislative violation of the constitutional amendment,
since it presupposes that there was power in the general
assembly to allow the mortgage security, which had been
taken by the State solely in order to secure the bonds she ·had
guaranteed, to be transferred to others as a means of securing
bonds to which her guaranty could not be constitutionally
affixed.    In other words, that the State, having a first mort-
gage security, which she had taken to secure bonds, of which
she was an endorser, could vitiate such security by allowing
others to participate in the benefits thereof, and thus do by
indirection what the constitution forbade her to do directly.

Nor does the case of *Railroad  Companies* v. *Schutte*, 103 .
U. S. 118, sustain this argument of the appellants.    There the
State of Florida issued her bonds to aid the railroads, secur-
ing herself by a first mortgage on the roads, and taking in
exchange bonds of the companies.    It was certified on the
state bonds that they were protected by a first mortgage " as
security for the holders thereof."    The bonds, thus drawn,
were endorsed by the railroad companies and issued by them.
The obligation of the State was found unconstitutional, but it
was held that, inasmuch as the railroad companies had en-
dorsed the bonds thus drawn, they had guaranteed the exist-
ence of the mortgage, and the holders of the bonds were
therefore entitled, as against them, to insist upon the validity
of the mortgage and to assert legal rights by virtue thereof.
In the present case there is no mention of the existence of a
mortgage on the face of the bonds declared on by the com-
plainants ; nor is there any statement of such mortgage in the
act of 1870 under which they were issued.    The claim here is
merely that a mortgage resulted from the statute passed in
1866, which statute in express terms reserves a mortgage only
for such bonds as are endorsed by the State.    The case relied
on involved no question of the existence of a mortgage, but

the point at issue wâs whether an admittedly existing mortgage could be enforced against the corporations.   Here, on the contrary, the question is, whether the mortgage under the act of 1866 ever existed *quoad* the bonds issued under the act of 1870.

These conclusions are decisive of the cause, but other considerations, which affect the merits of the controversy, are equally fatal to the appellants.   It cannot be doubted that, even if the bonds issued under the act of 1870 were secured by the statutory mortgage reserved by the act of 1866, they were second in rank, and therefore their holders were junior mortgage creditors.   Nor can it be gainsaid that the statutory mortgage conferred upon the State a power to sell the mortgaged property.   This power was exercised in 1875.   The grounds upon which it is asserted that the sale was void are :   First, that before the sale it was announced that only bonds of the issue of 1866 would be received in payment, and that at the sale it was declared that such bonds would only be received at their market value.   There is no averment in the bill that the first mortgage creditors complained of these requirements, nor does it contain any allegation that the holders of the second series of bonds, who are now championing the rights of the first mortgage creditors, bid at the sale, or in any way manifested their willingness to free the property from the first mortgage debt.   The rights of the second mortgage creditors were necessarily subordinate to the paramount rights of the creditors first in rank.   The property of the company had been for nearly two years under seizure, the default having occurred in 1873.   It was the plain duty of the second mortgage creditors, if they were interested in preventing the sale and wished to tender their bonds in payment, to bid a sufficient amount to lift the prior encumbrance. Not only is there no averment that they did this, but the bill contains an assertion that in the event the mortgage indemnified only the State, then equality of rank existed between the holders of the second and the holders of the first series of bonds, and upon this alleged equality the complainants, as holders of the second series, base their claim to participate

ratably in the distribution of the purchase money, and thus infringe upon the unquestioned rights of the bondholders under the act of 1866.

The other ground of attack upon the sale was the incapacity of the State to purchase at her own sale, which it is claimed resulted from the fact that the statutory mortgage reserved by the act of 1866 made the State a trustee for the bondholders. Conceding this, the State was both a trustee and a mortgagee, and she had a direct individual interest in the property, by reason of her endorsement on the bonds. The general assembly of the State of Georgia had expressly authorized the governor to bid in the property, on behalf of the State, in case there was no bid sufficient to protect the outstanding obligation which bore the State's endorsement. Even if this provision be considered inapplicable upon the ground that the State could not lawfully bid at the sale under a power conferred upon herself by herself, the complainants' position would be untenable. It is conceded that the settled doctrine in Georgia is that the purchase by a trustee is not absolutely void, but merely voidable at the option of the *cestui que trust.* *Worthy* v. *Johnson,* 8 Georgia, 236. Let us suppose, for the sake of argument, that the *cestuis que trustent* in this case were the holders of the bonds which were issued under the act of 1866 and of those which were issued under the act of 1870. The bill contains an averment that the holders of the first class surrendered their bonds to the State after her purchase of the property, and that she has discharged her liability under her endorsement upon their bonds. In retiring these bonds the State paid off the first mortgage debt, not only to the extent of her bid, but to nearly twice its amount. The action of the first mortgage creditors in accepting the extinguishment by the State of their securities and the mortgage by which they were secured was, in effect, a ratification of the sale, and established its legal validity so far as they were concerned.

Under these circumstances, conceding that the second series of bonds were secured by a second mortgage, their holders cannot equitably be allowed to avoid the sale without tender-

·ing reimbursement of the amount of the first mortgage. Their claims were subordinate to those of the holders of the first series, and they have no recourse until the latter are paid, and it would be grossly inequitable, to allow them to avoid a sale which has been ratified by those who were primarily interested in the price resulting therefrom without compelling them, as a prerequisite, to do equity by protecting the first encumbrancers. *Collins* v. *Riggs*, 14 Wall. 491; Jones on Mortgages, sec. 1669; Pomeroy's Equity, sec. 1220 *et seq.* Instead of doing this, although nearly two years had elapsed between the sale and the filing of the bill, the complainants assert that their bonds are, in the contingency last stated, equal in rank of mortgage lien with those of the holders of the first series, and hence that they are entitled to an equal participation in the proceeds of the mortgage property. Indeed, in the discussion at bar, the contention was advanced that the retirement of the first mortgage bonds, by the State, after her purchase, extinguished the prior mortgage by which they were secured, and that, the sale being voidable at the instance of complainants, — an option which their bill asserts, — the second mortgage, which was held by them, has thus become first. No offer to pay the amount of the first mortgage was made prior to the purchase of the property by the defendants, and their title cannot now be divested, even if such an offer were made. We think the complainants are not entitled to the relief which they claim, and that the property passed to the defendant free from any lien under the statutory mortgage arising from the act of 1866 or 1870, even if from the latter any such mortgage ever resulted.

*Affirmed.*