WEIL v. ALABAMA STATE LAND CO. et al.

(Circuit Court, N. D. Alabama, S. D. December 20, 1909.)

No. 202.

1. RAILROADS (§ 37*)—PUBLIC AID—STATE BONDS—SECURITY.

Act Ala. January 11, 1870 (Acts 1869-70, p. 89), authorized the issuance of state bonds in aid of the Alabama & Chattanooga Railroad Company as a loan of the state's credit to expedite the construction of the road. The state bonds were to be issued only in exchange for the first-mortgage bonds of the railroad, secured by the railroad's land grants from the federal government. The act also provided that the directors and stockholders of the railroad company should be held personally liable "to the state" for any loss incurred by any conscious violation of the act, and, if the bonds should not prove sufficient to secure the state, the Governor was authorized to require the railroad to give a second mortgage on its railroad "ample and sufficient to secure the state from any loss by the issuance of state bonds." A sinking fund was provided for to be used in the purchase of railroad company's bonds in the hands of the state, which were then to be presented to the State Auditor for cancellation and returned by him to the company, which presentation and cancellation to the required amount each year should constitute a full compliance with the first section of the act. Personal security was also required by the state for the completion of the road, conditioned that, on failure to complete and equip as required, the surety should become liable to the state for the entire amount of the bonds of the state which the company should receive. Held, that the holders of state bonds issued under such act had no interest in the security given the state by the company, the railroad company owing no duty to such bondholders but only to the state, and hence the bondholders could not enforce their bonds as against the granted lands mortgaged to the state.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 73; Dec. Dig. § 37.*]

2. SUBROGATION (§ 36*)—PERSONS AGAINST WHOM ENFORCEABLE.

Since the state and not the railroad company was the principal debtor on the state bonds, and payment by the railroad company to the state for the redeemed bonds discharged the railroad company's obligations, the holders of the state bonds had no right by subrogation to look either to the railroad company or to its property pledged for indemnify to the state for the payment of such bonds, and this especially after the state had parted with the lands mortgaged and received therefrom $40,000 in addition to the surrender of 1,883 of its credit bonds.

[Ed. Note.—For other cases, see Subrogation, Cent. Dig. § 99; Dec. Dig. § 36.*]

3. COURTS (§ 96*)—FEDERAL COURTS—RULE OF DECISION—DECISIONS OF SUPREME COURT.

Decisions of the Supreme Court of the United States on similar questions are binding on the lower federal courts, though not in line with the current of authority in other jurisdictions.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 325, 327, 328; Dec. Dig. § 96.*]

Suit by A. J. Weil against the Alabama State Land Company and others. On demurrer to bill. Sustained.

Willett & Willett, for complainant.

Smith & Smith, for defendants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

GRUBB, District Judge. The complainant is the holder of seven of the bonds of the state of Alabama, a part of an issue of 2,000 bonds, authorized by and issued under an act of the Legislature of Alabama approved February 11, 1870 (Acts 1869-70, p. 89), entitled an act "to loan the credit of the state of Alabama to the Alabama and Chattanooga Railroad Company, for the purpose of expediting the construction of the railroad of said company within the state of Alabama." The bonds were issued to the railroad company and by it sold in the market. The bill of complaint seeks to charge certain lands in the possession of the defendant the Alabama State Land Company with payment of said state bonds, by virtue of an alleged equitable lien or right of subrogation, created under the terms of the act of the Legislature under which they were issued, by which said lands, granted to said railroad company by the United States, were required to be mortgaged to the state of Alabama to indemnify and protect it against loss from the loan of its credit to said railroad company by the issue to it of said state bonds. Under the provisions of a subsequent act of the Alabama Legislature, known as the "debt settlement act," the defendant the Alabama State Land Company acquired title to said lands from the state of Alabama by the payment of $10,000 and the surrender to it for cancellation of 1,883 bonds of said issue; the remaining 117 bonds, part of which are complainant's, not having been presented under the terms of the "debt settlement act" for liquidation.

The conclusion reached by the court makes it unnecessary to consider any question except the effect of the act of February 11, 1870, and of the bonds issued under it, to create a right of subrogation in favor of the holders of the state bonds, or an equitable lien in their favor, upon the security given by the railroad company to the state of Alabama, as a condition of the issue of the state bonds to it. If no such equitable right or lien existed in favor of the state bondholders, the bill of complaint is without equity.

This inquiry is to be determined by the character of the transaction between the state, the railroad company, and the holders of the state bonds, as deduced from the language of the act, authorizing the issue of the bonds and providing for the security to be given the state by the railroad company, and by that of the bonds themselves.

The bond purports to be the obligation of the state only. The only reference to the railroad company contained in the bond is the recital of the title of the act under which it was issued, as follows:

"The faith and credit of the state of Alabama are hereby pledged for the payment of the principal and interest of said bond, under the provisions of an act of the General Assembly of the state of Alabama, approved February 11, 1870, entitled an act to loan the credit of the state of Alabama to the Alabama and Chattanooga Railroad Company for the purpose of expediting the construction of the railroad of said company in the state of Alabama."

Except for this reference, the bonds are in the ordinary form of obligations of the state, executed by the state alone, payable to bearer, and bear no indorsement, and would entitle the holder to look no further than to the faith and credit of the state of Alabama for their payment.

The language of the reference rather strengthens this inference that the recourse of the holder is confined to the faith and credit of the state. Nothing is pledged for the payment of the bonds by it, except "the faith and credit of the state of Alabama," as prescribed "under the provisions" of the act referred to. The purchaser of the bond is not misled by any recital thereof into relying upon any assurance for the payment of the bond, other than the obligation of the state issuing it.

Assuming that the act referred to in the bond, as authorizing its issue, became part of the bondholder's contract, entitling him to any benefit accruing to him from its terms, though not embodied or referred to in the bond itself, the proper construction of the act, as to the right of the bondholder to claim the benefit of the security required by its terms to be given, and which was in fact given, by the railroad company to the state, is involved.

The purpose of the act was to loan the credit of the state of Alabama to the railroad company by lending it state bonds to assist in the completion of its road in this state. The benefit accruing to the company was the obtaining of funds for this purpose on the state's credit, which it could not have done upon its own. The consideration moving to the state was: (1) The advantage of the completion and operation, under terms contained in the act, of the road; and (2) the return of the state bonds, or their value, loaned to the railroad company. To secure, the performance of each of the considerations moving to the state was the purpose of the lawmaker. The provisions of the act show this to have been the purpose in demanding security from the company. By section 1 the bonds were only to be issued to the company as the building and equipping of the road progressed in completed sections. The state bonds were to be issued to the company only in exchange for its first-mortgage bonds, secured by first mortgage on the land-grant lands, some of which are involved herein. The directors or other officers and incorporators and stockholders of the company were by its terms "held personally liable to the state for any loss incurred" by any conscious violation of the act. If in the opinion of the Governor the first-mortgage bonds should not prove sufficient "to amply secure the state from all harm and loss from the issue of the above-mentioned state bonds to said railroad company," then he was required to demand, and the company to give, a second mortgage on its railroad "amply sufficient to secure and protect the state from any loss by the issue of said state bonds." By section 2 a sinking fund was provided for, to be used in the purchase of the company's bonds in the hands of the state, which were then to be presented to the State Auditor for cancellation and returned by him to the company; "and such presentation and cancellation of said bonds to the amount required each year, shall be a full compliance with the provisions of the foregoing section of this act," and this, though the state did not appropriate the purchase money to the payment of its own bonds, conclusively showing that the state bondholders had no interest in the security given the state by the company, and that the railroad company owed the bondholder no duty in the matter of such

security, but only to the state. By the third section of the act, personal security was required to be given to the state by the company to secure the completion of the road, in amount not less than the aggregate of state bonds issued to the company, conditioned that the company complete and equip the road by a fixed time, and, in the event of its failure, its personal surety became "liable jointly and severally to the state of Alabama for the entire amount of the bonds of the state which said company may receive under this act."

The investment of the state in the railroad was represented by the bonds issued to it. If the railroad failed of completion, by failure of the enterprise, not only would the state lose the advantage accruing from a completed and operated railroad, but in that event the security of the railroad bonds, by which it was indemnified, would probably be valueless, and it would be liable for the amount of its own bonds issued to the railroad, without reimbursement. To protect itself against such loss, it required personal bond of indemnity in addition to the railroad's mortgage bonds in its hands for the same purpose. It would hardly be contended that the state bondholders could resort to such personal bond of indemnification for payment of their bonds. Yet there is as much reason for contending that the one was intended for their security as the other. Nor could it be contended that resort could be had against the company or the mortgaged property by the bondholders, if the company paid its bonds to the state and the state failed to use the money to pay its own bonds, leaving them in default. The provisions of the act, relating to the security to be given to the state by the company, construed alone and with the act, as an entirety, and in connection with the purpose of the state in requiring security of the railroad company, convince me that security was intended solely to protect and indemnify the state against loss likely to arise out of the loan of its bonds to the company, and the failure of the company to repay the loan and to complete and operate the road, the inducement thereto; and not to benefit the state bondholder, who by the terms of the bond, as well as the terms of the act itself, was required to look to the faith and credit of the state, which was all that was pledged either by the bond or the act for the payment thereof. If the security of the mortgage bonds of the railroad company was not provided or intended for the benefit of the state bondholder, then, clearly, he has no lien, in law or in equity, upon the lands mortgaged; nor has he any recourse upon the railroad company itself.

The case of Railroad Companies v. Schutte, 103 U. S. 118, 26 L. Ed. 327, is distinguished from this case in that the bonds involved in that case contained on their face a certificate by the Governor, which the railroad company adopted as its own, by circulating the bonds, that the state held "the first-mortgage bonds of the railroad company for a like amount as security to the holder thereof." This certificate was authorized by the act authorizing the issue of the bonds, which provided that upon a sale of the property, mortgaged to the state by the railroad company, the proceeds were to be invested by the State Treasurer in United States securities, "to be held by the state of Florida as trustee for the bondholders," until their demand for the payment

of the state bonds, when the securities were to be turned over to them. Thus by the terms of the bond, and of the act, a contract was entered into between the railroad company, the bondholder, and the state, that the mortgaged property was to be held by the state in trust for the bondholders. Not only are no such provisions to be found in the bonds or act in this case, but the language and provisions of both clearly show that the security was intended only for the indemnity of the state.

In the case of Cunningham v. Macon & Brunswick R. R. Co., 156 U. S. 400, 15 Sup. Ct. 361, 39 L. Ed. 471, the bonds were those of the railroad company itself, indorsed by the state. The railroad company was, as to the bondholder, the principal debtor. The statute authorizing the state indorsement, and creating the lien on the railroad property in favor of the state, provided (page 402 of 156 U. S., pages 361, 362, of 15 Sup. Ct. [39 L. Ed. 471]) that the indorsement should "vest the title of all property of every kind which may be purchased with said bonds in the state, until all the bonds, so indorsed, shall be paid," and that, upon default by the company in payment of its bonds, the state should take possession of the mortgaged property and apply the earnings "to the extinguishment of said bond or bonds or coupons." The bonds were those of the railroad company, secured by a trust deed on its property, executed to the state as trustee for the bondholders, and by the indorsement of the state. This constituted the ordinary transaction of a corporate loan evidenced by bonds, secured by deed of trust, with collateral personal security by indorsement, and it requires no argument to show that such security was intended to and did inure to the bondholders; nor that the transaction here involved is a different one in legal effect.

The Supreme Court, in the case of Chamberlain v. St. Paul R. R. Co., 92 U. S. 299, 306, 23 L. Ed. 715, said in reference to a similar transaction to that involved in this case:

"In this case the deed and mortgage to the state were not intended to create a trust in favor of the holders of her own bonds. The state was primarily liable to the bondholders, and it was only as between her and the company that the relation of principal and surety existed. It may be doubted whether the bondholders could call upon the company in any event. The indorsement made by the president simply transferred the bonds; it was not the act of the company. Be that as it may, whatever right the plaintiff had to compel the application of the lands received by the state to the payment of the bonds held by him, it was one resting in equity only. It was not a legal right arising out of any positive law or any agreement of the parties. It did not create any lien which attached to and followed the property."

In the case of Cunningham v. Macon & Brunswick R. R. Co., 156 U. S. 400, 419, 15 Sup. Ct. 361, 365, 39 L. Ed. 471, the court said:

"It is obvious that if the statutory mortgage created by the act of 1866 was solely for the indemnification of the state and not for the security of the bondholders, the latter, whatever may be their indirect rights by subrogation, cannot directly avail themselves of the statutory mortgage."

It has already been determined by the court that the mortgage in the case at bar was given exclusively for the indemnification of the state.

The same conclusion was reached by the Supreme Court in the Tennessee Bond Cases, 114 U. S. 663, 5 Sup. Ct. 974, 1098, 29 L. Ed. 281, based upon a statute and bond similar in legal effect to those in this case, and which seems to me to be controlling of this case. The conclusion, as expressed in the first paragraph of the syllabus in that case, is as follows:

"The Legislature of the state of Tennessee, on the 11th of February, 1852, enacted a law 'to establish a system of internal improvements,' in which it was provided that the state should issue to certain railroad companies therein named its negotiable coupon bonds, and that, when the respective roads should be completed, the state should be invested with a lien upon each road and its superstructure and equipment, 'for the payment of all of said bonds issued to the company, as provided in this act, and for the interest accruing on said bonds.' Held, in view of other provisions in the act, and of the practical construction put upon it, that the lien thereby created was created to secure payment to the state of the amount of indebtedness it thus undertook to incur, and not payment to the holders of the state bonds thus agreed to be issued; and that the state could accept payment in other mode or modes than those pointed out by the act or acts creating the lien, and could cause the property to be released from it, either by legislation, or by foreclosure under the statute, while the bonds issued to the company for the construction of the road released or foreclosed were still outstanding and unpaid."

This disposes of the inquiry so far as it relates to the existence of a lien on the mortgaged lands, enforceable by the complainant. It remains to consider whether the complainant is entitled to be subrogated to the security, placed by the railroad company in the hands of the state for its indemnity. This is claimed upon the idea that the transaction, in legal effect, if not in form, constituted the railroad company the principal debtor and the state its surety.

In the case of Chamberlain v. St. Paul R. R. Co., 92 U. S. 299, 306, 23 L. Ed. 715, the court, speaking of the legal effect of a similar transaction, said:

"The state was primarily liable to the bondholders, and it was only between her and the company that the relation of principal and surety existed. It may be doubted whether the bondholders could call upon the company in any event."

And in the Tennessee Bond Cases, supra, the second paragraph of the syllabus is as follows:

"The relation of principal debtor and creditor at no time existed under the acts of the Legislature of Tennessee referred to in the opinion of the court, between the railroad companies and the holders of the state bonds issued under the act; nor did the state at any time under those acts hold the relation of surety toward such holders. The state was at the outset and remained the sole debtor bound on the bonds."

These cases seem to me conclusive that there was no relation of suretyship on the part of the state in the case at bar, since the bondholders, by their contract, had a right to look to the state of Alabama alone for the payment of their bonds. If the state occupied the position of principal debtor, and not that of surety, to the bondholders, then the doctrine of subrogation would have no application, since subrogation applies only to property in the hands of a surety. It seems doubtful if there was any such privity of contract between the bondholders

175 F.—17

and the railroad company as to give the bondholders recourse of any kind against it.

The principle of subrogation was also held by the Supreme Court to be inapplicable to a similar transaction, for the reason that, if the state was held to be a surety, subrogation could not be enforced against it, and there not being a specific lien upon the property, could not be enforced against its grantees. Chamberlain v. St. Paul R. R. Co., 92 U. S. 306, 23 L. Ed. 715. So, in the case of Cunningham v. Macon & Brunswick R. R. Co., 156 U. S. 400, 419, 15 Sup. Ct. 361, 365, 39 L. Ed. 471, the court said:

"A right of subrogation, such as is here claimed by the appellants, does not involve any direct lien in favor of the creditor, resulting from his position as such. It only exists in consequence of his being, as a creditor, entitled to enjoy certain rights which are vested in the surety at the time the subrogation is claimed. This principle is fundamental, and its application is fatal to the complainants. As the creditors'. right to subrogation depends on the existence, in the surety, of the rights to which subrogation is sought, it follows that, after the surety has parted with the thing given him for his protection, the creditor can have no subrogation to such thing. In the present case, when the subrogation was claimed, the state had divested herself of all of her rights, under the mortgage of indemnity, by selling the mortgaged premises, and had applied the proceeds of the sale to the payment of the debt which the mortgage was given to secure. She had no longer any rights of her own, therefore no subrogation could be derived through her. Aside from this consideration, in order to enforce equitable subrogation against a surety, he must be made a party to the cause. The state of Georgia is not, and cannot be, without her consent, impleaded."

Subrogation was held inapplicable to such case (1) because of the privilege of the state to be exempt from suit, and (2) because the state, if a surety and suable, had parted with the property, as to which subrogation was sought before it was claimed. In the case at bar, before the bill was filed by complainant, asking to be subrogated to the rights of the state in the mortgaged lands, it had parted with the lands to defendant, and received therefor the sum of $40,000, in addition to the surrender to it of 1,883 of its bonds by defendant.

The existence of an equitable right or lien in the bondholder depends in each case upon the construction of the bond and of the act authorizing its issue. If the language of neither, liberally construed, is sufficient to create such right or lien, none exists. This is all that is determined in the case of Tompkins v. Ft. Smith Railway, 125 U. S. 109, 8 Sup. Ct. 762, 31 L. Ed. 615. In that case the court said of bonds held to be in that predicament:

"The bonds were the bonds of the state 'pure and simple.' They carried on their face no express obligation of the railroad company to the holder. The promise made by the company, on the acceptance of the bonds, was to pay the state, not the bondholder. The failure of the company to meet its obligations to the state did not operate in any manner to relieve the state from its liability on the bonds. The debt of the state still remained, and was the only debt the bonds expressed on their face. The debt of the company was to the state for the bond, not to the bondholders on the bond. Payment to the state discharged the obligation of the company."

This language expresses the legal effect of the transaction, evidenced by the bond and legislative act in this case, and is convincing: (1) That, as payment to the state by the company for the loaned

bonds "discharged the obligation of the company," the bondholder had no right to look either to the company or to its property, pledged for the indemnity of the state, and hence had no lien on such property; and (2) that, as the company was not, as to the bondholders, the principal debtor and the state its surety, no right of subrogation existed in favor of the bondholder, as to the property of the company, pledged by it to the state for its indemnity.

The decisions of the Supreme Court, in the cases in which the bond and authorizing statute are of a like or similar legal effect to those in this case, are consistently to the effect that the bondholder has no equitable right or lien in the property pledged to the state for its sole indemnification. They are binding on this court, though not in line with the current of authority in other jurisdictions. It is said that they result in inequity, in that they justify the trustee in surrendering the trust property to a part of the cestuis que trust to the exclusion of the remaining part. If the transaction creates no trust relation in favor of the bondholders in the property pledged to the state, no such inequity exists. The state has the legal and equitable right to use such property for its exclusive benefit, in such manner as it may deem will best protect it against loss from its liability on the bonds, and the bondholders cannot complain of such use, though excluded from all participation therein. In this case, if the bondholders had no equitable lien upon or right of subrogation to the mortgaged lands, it was equitable, as well as legally competent, for the state to dispose of the lands mortgaged, as it did by the terms of the "debt settlement act." The enactment of such subsequent legislation by the state of Alabama may be looked to as a practical interpretation by its Legislature of the original legislation, as having conferred no rights or liens in on the mortgaged lands in favor of the bondholders. Tennessee Bond Cases, 114 U. S. 665, 5 Sup. Ct. 974, 1098, 29 L. Ed. 281.

The conclusion reached deprives the bill of equity; and the demurrer is sustained, with leave to complainant to amend within 30 days, if so advised; otherwise the bill to stand dismissed, at the costs of complainant.